**In re RUSTY JONES, INC., Debtor.**

**Bankruptcy No. 88 B 18708.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

Feb. 9, 1990.

Note 1—Continued

See also, Bkrtcy., 107 B.R. 161.

Karen H. Moore, Office of the U.S. Trustee, Chicago, Ill.

Marvin A. Miller, Chertow & Miller, James Carmel, Carmel, Baker & Marcus, Chicago, Ill., William Wolford, Wisconsin Dept. of Justice, Madison, Wis. for Official Warranty Claimants Committee.

Robert Nord, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for Distributor Claimant Committee.

Frank Butler, Winston & Strawn, Chicago, Ill.

James A. Chatz, Norman Newman, Much Shelist Freed Denenberg Ament & Eiger, P.C., Chicago, Ill., for debtor.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING HEARING ON CONFIRMATION

JACK B. SCHMETTERER,
Bankruptcy Judge.

The Court conducted an evidentiary hearing on the Fourth Amended Plan of Reorganization, as modified (the "Plan") proposed by the debtor, Rusty Jones, Inc. ("Rusty Jones or Debtor"), and on objections thereto filed by Beatrice Foods and voiced orally by the U.S. Trustee, on January 11, 12, 17, 18, and 19, 1990. Rarely has this Court seen abuses of the bankruptcy process such as those found and proposed here. Based upon evidence admitted and arguments presented at that hearing and undisputed facts earlier presented to the Court during this case, the Court makes and enters the following Findings of Fact and Conclusions of Law pursuant to which confirmation is denied.

### FINDINGS OF FACT

1. Rusty Jones has been in the business of providing various automotive care ser-

vices to consumers, including rustproofing treatment. Prior to August 1, 1988, Rusty Jones provided a warranty with the rustproofing treatment which it offered to consumers.

2. (a) On December 5, 1988, Debtor filed its voluntary petition (the "Case") under Chapter 11 of the Bankruptcy Code, Title 11 U.S.C. § 101 et seq. (the "Code"). It has since remained in possession of its property and has operated its business as a debtor-in-possession pursuant to §§1107 and 1108 of the Code.

(b) About two weeks prior to filing bankruptcy, Debtor was "purchased" by Rustco Holdings Inc. ("Rustco") for $1.00. Rustco thereby acquired 100% of Debtor's common stock. Debtor then possessed cash and cash equivalents totalling about $3,000,000.

(c) Rustco stock is owned 60% by Renaissance Holdings I, Inc., 40% by Charles Wortman. The common stock of Renaissance Holdings I, Inc. is owned entirely by Renaissance Capital, Ltd. Alexander Knopfler, Donald Grauer, and Jeffrey Grossman own 100% of the stock in Renaissance Capital, Ltd.

To diagram the foregoing:

Knopfler, Grauer, and Grossman

own 100% stock in

Renaissance Capital, Ltd.

which owns 100% of stock in

Renaissance Holdings I, Inc.

which in turn owns 60% of stock in

Rustco Holdings, Inc.

which in turn owns 100% of stock in

Rusty Jones, Inc.

(d) Debtor's President until one day before the instant hearing began was Charles Wortman. He then resigned. Mr. Grauer, who is President of Renaissance Capital, Ltd., is now an officer of Debtor. Mr. Grossman is also now an officer of Debtor. Renaissance Capital, Ltd. is a corporation

that Knopfler, Grauer, and Grossman formed to act as a consultant to distressed businesses.

3. Rusty Jones commenced this case in bankruptcy because of its significant contingent liabilities to warranty holders, estimated from $30 million to $50 million. It has since continued as debtor-in-possession, but at a sharply reduced scale which it slowly reached after many months. Its only current operating activity is its operation of "Rusty's Place," a small service center operated by one employee. Despite that minimal function (designed to maintain use of its trademark so as to maintain the value of that mark), Debtor leased and continues to lease an additional office location for its salaried president and salaried office administrator.[1] Largely because of the latter rental and salaries, it continues to operate with a negative cash flow for operations (non-bankruptcy expenses) of from $25,000 to $40,000 each month. This includes a negative cash flow of $10,000/month for Rusty's Place operations.

4. On the date that Rustco purchased stock in Rusty Jones, Rusty Jones had approximately $3,000,000 in cash or cash equivalents in its accounts. This bankruptcy case was filed about two weeks later. Debtor then had about $275,000 less in cash and cash equivalents. Moneys paid out during the intervening two weeks went to Renaissance Capital, Ltd., the company controlled by Knopfler, Grauer and Grossman. This company in turn controls Debtor through intervening holding companies as shown above.

5. Wortman, the former president of Rusty Jones who resigned just prior to the commencement of the confirmation hearing, testified at the hearing. The Court recognizes that he had personal motives, both in failing to come forward earlier and in coming forward when he did. Nonetheless, his specific testimony was largely unrebutted and credible.

---

1. The titles and persons holding them have changed since Mr. Wortman's resignation. During the period prior to the confirmation hearing, Rusty Jones' employees were essentially: Wortman, President; Lynn Refer, Vice President; Michelle Stein; Office Administrator.

6. Based on prior proceedings before this Court, the testimony of Wortman, and the other facts found herein, it is clear that Debtors' present officers Grauer and Grossman have at all times during this case controlled Rusty Jones through their holding companies. Further, those persons made several efforts during this bankruptcy to bleed Rusty Jones of its assets so as to benefit one or more non-debtor businesses. Unless prevented, they will continue to do so in the future. They succeeded in doing so only in small ways in the past because of the vigilance of the U.S. Trustee and this Court's refusal to sanction such efforts when made by motion, and because the former president Wortman sometimes blocked them from doing so when they tried to do so out of court.

7. The persons who were in control of Rusty Jones did not exhibit sufficient concern for the fiduciary obligation that people who control Chapter 11 estates owe to the estate and the estate's creditors, nor did they take seriously their responsibility to preserve estate assets.

8. Had those "investors" who acquired control over a $3 million cash pot in return for a $1.00 investment been conscientious, they could have helped preserve this estate and pare down the overhead below current levels. Instead, they repeatedly tried to take untoward advantage of their position. The investors could have helped negotiate a confirmable plan. Instead, as set forth below, the proposed plan is a palpable overreaching by the controlling investors, and evidence presented was distorted by not requiring Debtor's valuation expert to take known evidence into account.

9. Rusty Jones presently retains only about $1,500,000 in cash and cash equivalents. Much of the $1,500,000 that it spent since the bankruptcy was filed was devoted to proper and necessary expenses, e.g., honoring a letter of credit (Debtor and both official creditors committees assured the Court there was and is no recourse to recover $500,000 thereby expended); necessary expenses in reducing the business scope; necessary protective steps; approved expenses necessary to the bankruptcy processes of notices, ballots, disclosure statement, and confirmation hearing; and interim professional fees that were approved. Other parts of that cash drain, however, resulted from the payment to Renaissance that was only partly repaid and from continued excessive overhead for many months longer than necessary. The latter drain continues today, albeit at a smaller level (Finding No. 3). The new "investors" during this bankruptcy made a number of efforts, some of which were successful, to obtain direct or indirect benefit from the cash assets with which Debtor started this bankruptcy. Most of those efforts were not for good business reasons and were contrary to the interests of the estate and its creditors. Some of these efforts were by motions to the Court before the instant hearing and some were proved by evidence during the hearing. Specifically:

(a) Rusty Jones moved the Court early in the case to authorize it to assume a management contract which had been entered into with Renaissance Capital, Ltd. during the two-week period between Rustco's "purchase" of Rusty Jones and Rusty Jones' commencement of this case. That management contract would have cost Rusty Jones substantial sums, amounting to several hundred thousands of dollars. Rusty Jones had made a substantial deposit of approximately $275,000 including interest on account of that management contract. Due to questions raised by the U.S. Trustee and Court at the time, Rusty Jones withdrew its motion to authorize the assumption of that management contract. From the deposit Renaissance later returned $179,744 to Rusty Jones under court order. Retention of the balance was not approved, nor was approval sought or retention explained. Because Debtor withdrew its motion, it now argues that the Court has no basis for any adverse conclusions relating to it or to the management contract. That is an argument without logic. This Court saw the agreement, held a hearing on it and took evidence. Debtor cannot wipe the slate clean by withdrawing a motion once the results become

obvious. The Court believed then and still finds that the contract itself was unwarranted, without substantial benefit to the estate, and unnecessary. On the face of it, this episode raised the question whether the "investors" who purchased control of Debtor for a dollar were overreaching in their effort to get Debtor to fund an expensive "management" contract with their other company (Renaissance) although there was precious little remaining to manage and salaried officers were doing what was required.

(b) Shortly thereafter, Debtor moved the Court for authorization to add the three "investors," Knopfler, Grauer and Grossman, to Rusty Jones' payroll. Those persons were to be paid significant salaries by Rusty Jones ($30,000 each, totaling $90,000/annum) in return for services supposedly related to its reorganization, including both management services and development of a business plan to market Debtor. The officers of Debtor were to continue receiving salaries. The U.S. Trustee objected. That motion was denied, the Court finding that the supposed services were of little value to the estate or its creditors, and the individuals were disqualified as not disinterested. (Opinion filed August 24, 1989.) Apart from the legal and other reasons then given, the motion was another improper attempt to strip Rusty Jones of significant assets without any demonstrated necessity or benefit to Debtor in return. The motion to approve it was outrageous. The Court felt so strongly that the motion was inappropriate and totally without value to Debtor that it denied Rusty Jones' counsel any compensation for that work.

(c) Rusty Jones entered into two oral lease agreements for its present locations. The landlord at one of these locations is a company in which at least one of the investors who controls Rusty Jones also holds an ownership interest. This was done without notice, motion, Court review of the propriety of the oral lease agreements, or prior disclosure of the dual interest.

(d) For a time, Rusty Jones employed the son of one of the investors who control Rusty Jones. Also, the employee of Rusty Jones who performs secretarial services was utilized by one of the investors to help provide some reception type services at a business in which he has an interest. The latter business is unrelated to Debtor or its business.

(e) Other unsuccessful efforts to obtain excessive rental and improper payments from Debtor were testified to and established by Wortman, Debtor's former president. Still other testimony by Wortman alleged misuse of Debtor's personal property, but did not establish that by detail or corroboration.

(f) The Plan of Confirmation proposed by Debtor was in large part for benefit of the investors and their holding company. To persuade the Court to confirm it, they offered evidence from an expert who was not directed to consider obviously relevant facts in his opinions, as discussed below. Indeed in one respect described below (Finding No. 20) the Plan was obviously not confirmable, making the whole confirmation process and hearing an expensive exercise that can hardly be justified.

10. The principal assets of Debtor now consist of cash and cash equivalents, accounts receivable, inventory, its trademarks, (see Debtor Exhibit, Appendix 1 hereto) and a law suit against Beatrice Company which Debtor values as worth at least $10 million. Counsel are prosecuting the latter suit under an approved contingent fee agreement.

11. (a) Debtor's Plan essentially proposes that all post confirmation income of reorganized Rusty would go to it, all for the benefit of its stockholder the holding company controlled by the "investors". Most cash assets are to be distributed under the Plan to pay administrative expenses and for benefit of the creditors through a Creditors Trust. Debtor's Plan provides that the principal business of reorganized Rusty Jones will be the licensing and other use of its trademark. Rusty Jones has entered into an agreement with ECP, Inc. ("ECP")

under which *inter alia* ECP would pay a royalty to Rusty Jones for the use of its trademarks, and would take its inventory on consignment, projected by Debtor to produce a stream of payments totalling $1,415,000 during the first five years. Court approval of this agreement was contingent upon confirmation of the instant Plan. Rusty Jones also plans to explore other opportunities with regard to the use of its trademark in areas not otherwise covered by its agreement with ECP. Under the Plan, none of the income to the reorganized Debtor would benefit pre-petition creditors. In addition, net recovery from the Beatrice litigation is to be shared 80% to the Creditors Trust, 20% to reorganized Rusty.

(b) Debtor's Plan classifies Rusty Jones' creditors into seven different classes. Classes 1–3 include administrative and priority claims under 11 U.S.C. §§ 503 and 507. These classes are to be paid in full upon confirmation out of cash on hand. Class 4 includes secured claims, although there are no known secured creditors at this time. Unsecured creditors, including the quarter-million warranty holders who filed claims, are included in Class 5. Class 6 includes Rustco, Debtor's current shareholder, who under the Plan would retain its ownership of Rusty Jones stock, thereby benefitting from post-confirmation income. Class 7 was to consist of the Beatrice Company, as former owner of Rusty Jones, but Debtor acknowledged at the hearing (and Beatrice counsel agreed) that Beatrice is a Class 5 creditor. Therefore, there is no Class 7.

(c) The Plan provides for the partial payment of Class 5 claims through the creation of a trust (the "Creditors' Trust"). The Creditors Trust would be administered by a trustee who will oversee the liquidation and payment of Class 5 claims. Upon confirmation, Debtor would pay into the Creditors' Trust from funds on hand $675,000 in cash for distribution, $50,000 to cover anticipated Creditors Trust administrative expenses, and $100,000 to cover litigation expenses incurred in connection with the Beatrice litigation. The inventory of rustproofing materials and other assets would be retained by the reorganized Debtor. Cash left over from Debtor's cash assets after all Plan distributions (about $94,000 projected) would be held by reorganized Debtor as operating capital. Finally, the Plan provides that 80% of the net after tax proceeds, if any, from Debtor's litigation against Beatrice would be paid to the Creditors' Trust. Although the legal structure of the remainder of any recovery is quite complicated, in effect reorganized Rusty Jones would retain the remaining 20% of such net litigation recovery.

(d) An additional amendment to the Plan (the "Amendment") was introduced on the first day of the confirmation hearing. The portion of the Amendment pertinent to these findings provided that 10% of the outstanding Rusty Jones common stock would also be contributed to the Creditors' Trust. This stock, however, would be redeemable at Rusty Jones' option for the greater of $50,000, the book value of the stock, or market value up until the time the Trustee of the Creditors' Trust makes its final distribution to Class 5 creditors. During the time in which the Creditors' Trust would hold the Rusty Jones stock, reorganized Rusty Jones must furnish to the Creditor's Trust certain financial information.

12. Rusty Jones submitted as Debtor's Exhibit 1 (Appendix 1 hereto) a projected liquidation statement as of January 15, 1990, which purported to show Rusty Jones' assets, expenses and funds available to distribute to creditors on that date in a liquidation under Chapter 7 of the Code. Included in that exhibit were Rusty Jones' projections of the value of its accounts receivable and trademarks, its estimated professional and administrative costs, the estimated cost to dispose of inventory, and projected Chapter 7 legal fees and distribution costs. Debtor sought to establish the various values set forth in its Exhibit 1 through evidence at the hearing.

13. Rusty Jones entered into a contract with Dun & Bradstreet under which Dun & Bradstreet would collect Rusty Jones' accounts receivable totalling about

$2,000,000 (about $700,000 of which has since been released in a settlement). The expert witness who testified concerning the value of Rusty Jones' accounts receivable had not examined this contract. No direct evidence was offered from Dun & Bradstreet as to the likelihood of success in collecting Rusty Jones' accounts receivable or their success up to this point. The expert's testimony on those questions was vague, not detailed. The testimony of the expert witness that the value of Rusty Jones' accounts receivable is only about $150,000 was not credible or reliable because it was based only on theoretical projections and opinions based on general experience in other situations rather than the actual collection contract and the collector's actual experience in this case.

14. The same expert testified that the liquidation value of Rusty Jones' trademarks are only $50,000. He gave a very sparse and cryptic opinion on that subject. His testimony did not take into account the income which Rusty Jones expects to receive from the contract with ECP, Inc. ("ECP") or additional income that Debtor projects it can earn from Rusty Jones' license of its trademarks in areas which are not licensed to ECP (projected by Debtor at more than $800,000 net over a five-year period). Instead of taking into account a real contract by an actual investor ready to pay contracted dollars for use of the trademark and Debtor's own future projections of earnings, he based his appraisal on a purchase by a theoretical and hypothetical investor, thereby arriving at an artificially deflated value. The testimony of the expert witness on the subject of the value of Rusty Jones' trademarks is therefore not credible. Indeed, it was a highly artificial effort by Debtor demonstrate a low liquidation value so as to meet the confirmation requirements of 11 U.S.C. § 1129(a)(7).

15. The same expert also testified that the age and shelf life of a large portion of Rusty Jones' inventory rendered it unsellable, and that due to environmental concerns a large cost ($450,000 or more) would be incurred to dispose of that inventory. He assumed that there was no purchaser for most of this inventory. However, the ECP agreement provides for the sale of that inventory to ECP on a consignment basis. Mr. Lynn Refer, one of Rusty Jones' officers, testified that he expects most, if not all, of the inventory to be used pursuant to the ECP Agreement. Also, a few months ago the Distributors' Committee served notice of and filed information with this Court showing serious interest by prospective purchasers of this same inventory. Neither Rusty Jones nor the expert witness contacted those persons to explore their interest in purchasing the inventory. The testimony of the Debtor's expert witness on the subject of cost to dispose of Rusty Jones' inventory is therefore not credible. Debtor and the expert closed their eyes to prospective purchasers in order to demonstrate an artificially high cost of liquidation under 11 U.S.C. § 1129(a)(7). In fact, it may well be that the product would have positive value in a Chapter 7 liquidation rather than become a $450,000 liability. Again the Debtor put on the valueless testimony in an effort to demonstrate confirmability under 11 U.S.C. § 1129(a)(7).

16. Solely for the purpose of this hearing and not for the purpose of any final determination or approval of the amount of professional fees to be paid by Rusty Jones following hearing and notice, the Court discounts Rusty Jones' estimate of expenses for professional fees by at least $50,000, which is approximately ten percent of the professional fees set forth in Debtor's Exhibit 1. This is based on the factors to be considered by the Court upon fee applications, including the factor of success. *In re Pettibone*, 74 B.R. 293 (Bankr. N.D.Ill.1987). When a Plan is not confirmed, the work of counsel is at least partly unsuccessful and not as valuable to the estate and its creditors as if the Debtor were successfully reorganized. The assumption of all counsel that they will receive 100% of their requested fees in this case is unrealistic. Moreover, at the hearing there were no fee applications presented, nor any evidence of fees that will be sought. The estimate of administrative fee

levels for professionals was based entirely on Debtor's projections based on monthly rates of prior fees requested, not upon evidence or even applications from the professionals involved. Therefore the Debtor failed to establish by credible evidence the $543,087 in administrative costs that it projected.

17. Certain costs which Rusty Jones included in its calculation of expenses in the event that Rusty Jones was liquidated under Chapter 7 of the Code (notably $125,000 in distribution costs and $50,000 in professional fees) also would be incurred in the event that the Plan was confirmed. Accordingly, these costs must be deducted from the amount that Class 5 Creditors would receive under the Plan in order to compare that amount to the amount that would be received by those creditors in liquidation under Chapter 7.

18. Rusty Jones' belated offer of 10% of its stock to its creditors under its Plan modification is worth no more than $50,000 to the creditors. Under the Plan modification Rusty Jones controls the timing of the redemption of that stock, and therefore it could redeem that stock on the eve of any event (such as the settlement of the litigation between Rusty Jones and Beatrice) that might cause that stock to be worth more than $50,000. Also, the stock is not publicly traded. Therefore, the alternative redemption prices based on public trading or book value are essentially meaningless.

19. Based on the foregoing and even before analysis of the Plan treatment of the Beatrice litigation, Debtor has failed to prove that all Class 5 creditors would receive at least as much from the Plan as modified as they would from a liquidation in Chapter 7.

20. Assuming there is a recovery against Beatrice, Rusty Jones' Class 5 creditors would also receive less from this recovery under the Plan, in which they would receive only 80% of the net amount recovered, than they would in a Chapter 7 liquidation wherein they would be entitled to 100% of the net recovery. The Court finds wholly unpersuasive the argument that the recovery from Beatrice would be greater if the Plan were confirmed. On the facts of this case, the likelihood of success in the litigation against Beatrice is not affected by any decision concerning the confirmation of the Plan. The case against Beatrice stands on its own merits. It is prosecuted by contingent fee counsel and is based on fixed documents and witnesses to events over past years. Rusty Jones is obligated to produce documents in connection with that litigation, and none of the persons with personal knowledge concerning events underlying that litigation remain employed by Rusty Jones.

21. Rusty Jones also called an expert to testify about the tax consequences resulting from the Plan. He testified that the Plan was structured in order to achieve grantor trust treatment. The benefit of such treatment, if accepted by the Internal Revenue Service, is that any tax on the income earned from the funds in the Creditors' Trust would be the responsibility of reorganized Rusty Jones, not that of the Creditor Trust. The 80%–20% allocation of the Beatrice recovery between the Creditors' Trust and Rusty Jones is said to be necessary to achieve this result. It is clear from the expert's evidence, however, that a 95%–5% split could achieve the same tax benefit for an adequate period. Moreover, the Debtor's tax expert testified and the Court finds that any tax savings to the creditors on investment earnings from any litigation recovery that resulted from allocating only 80% of such proceeds to the Creditors Trust would be substantially less than the value of the additional 20% of those proceeds that under the Plan would be retained by Debtor and its "investors" even if earnings on the Beatrice recovery were wholly taxable. Further, the tax treatment to a Chapter 7 trustee from receipt of any litigation recovery would be no different from the tax treatment on such receipt by the Creditors Trust under the Plan. Not surprisingly, 100% is more than 80% even if one pays tax on earnings from the amount received.

22. Accordingly, Rusty Jones' Class 5 unsecured creditors would clearly receive

more by obtaining 100% of litigation proceeds from the Beatrice suit and paying tax on the earnings thereon, rather than receiving 80% of those proceeds and not paying any tax on the earnings. The Class 5 creditors would clearly receive more from this source in a Chapter 7 liquidation than from the modified Plan.

23. Rusty Jones has not established that all of its Class 5 creditors would receive at least as much on account of their claims if the Plan were confirmed than in a liquidation under Chapter 7 of the Bankruptcy Code.

24. Rusty Jones also introduced into evidence Debtor's Exhibit 6, the future budget and projected revenues and expenses of reorganized Rusty Jones for the next five years (Appendix 2 hereto). These projections would be tenuous even if no other problems existed. The budget outlines three sources of cash: revenues from the ECP Agreement; other revenues from licensing and using the Rusty Jones' trademark aside from the ECP Agreement; and collection of accounts receivable during the two years after confirmation. The timing of such collection of receivables during the first two years is necessary to plan feasibility because most income from the ECP Agreement is projected for later years. The income stream projected from ECP is speculative during the first two years of that agreement.[2] In addition, the evidence did not support either the likelihood of revenues from use of the trademark beyond that provided in the ECP agreement or the projected timing of collection of accounts receivable during the first two years. Indeed, because the collection agent was not called to testify, no credible evidence supported the Debtor's two-year projection of such collections.

25. Rusty Jones' present management has no experience in the company's line of business. Paying the present level of salaries to this management is an excessive and unwarranted drain of funds from the estate, particularly since the only activity of Debtor is the one-person operation of Rusty's Place.

26. Confirmation of the Plan would likely be followed by need for further financial reorganization or liquidation of Rusty Jones. The Plan does not propose either liquidation or further financial reorganization.

27. All impaired classes of claims and interests have voted by the requisite majorities to accept the Plan. However, many creditors in class 5, which is an impaired class of claims under the Plan, did not vote to accept the Plan, and many voted not to confirm the Plan.

28. It has not been demonstrated that the Debtor cannot confirm a plan of reorganization. Indeed, a plan may yet be confirmable under the law.

29. Remarks of the Court at the conclusion of the hearing on January 19, 1990 and any findings of fact which are contained in the Conclusions of Law will stand as additional Findings of Fact.

30. Debtor's objection to the Findings proposed by Beatrice have in some instances been recognized in the foregoing Findings, and some of Beatrice's proposed Findings have not been adopted by the Court. Otherwise, those objections are overruled. Some of those objections choose to ignore the whole record. Others rested on the false assumption that it was objectors' burden to establish their objections under § 1129(a). The contrary was true; it was Debtor's burden to establish all elements under that statute, and therefore its burden to bring out factual details and explanations in the areas testified to by Mr. Wortman after his testimony raised questions and established facts prima facie.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter hereof pur-

---

**2.** This point is at the tip of one of the petards on which Debtor has hoist itself. If the projected ECP payments are real (as Debtor, ECP and this Court believes), then the expert's low valuation of the trademarks is nonsense. If the projected income stream is not real, then Debtor's budget for post-confirmation operations is meaningless. At any rate, the Court's finding here is that the cash flow is speculative during the crucial first two years post confirmation.

suant to 28 U.S.C. §§ 1334(a), (b) and 157(a).

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).

3. To be confirmed, a plan of reorganization must satisfy all thirteen requirements of 11 U.S.C. § 1129(a), except that if a plan of reorganization satisfies all of the requirements of § 1129(a) except for subsection (8) thereof, that plan of reorganization nevertheless may be confirmed if it also satisfies the requirements of 11 U.S.C. § 1129(b).

4. Given that all classes of claims and interests have accepted the Plan by requisite majorities, the requirements of 11 U.S.C. § 1129(a)(8) have been satisfied and no consideration need be given to the question whether the Plan satisfies the requirements of "cram down" under 11 U.S.C. § 1129(b). However, it is clear that Rustco's retention of its equity ownership interests, without full payment to Class 5 creditors, means that the Plan could not pass the "fair and equitable" test so as to be confirmable under § 1129(b).

5. The proponent of a plan of reorganization has the burden of proving by at least a preponderance of the evidence that the plan satisfies all of the requirements of 11 U.S.C. § 1129(a). Authority requires that the proponent must prove by clear and convincing evidence all elements to meet the requirements of § 1129(b). *In re Future Energy Corp.*, 83 B.R. 470, 481 (Bankr.S.D.Ohio 1988); *In re Agawam Creative Marketing Associates, Inc.*, 63 B.R. 612, 618–19 (Bankr.D.Mass.1986). The foregoing and similar authority could be read to require clear and convincing evidence under § 1129(a) as well. Because Debtor has not even met the preponderance of evidence test, we need not decide the burden under that provision.

6. An objector to a plan of reorganization has the burden of proof on any affirmative defenses to confirmation, such as fraud. *In re Hartford Corp.*, 18 B.R. 536 (Bankr.S.D.N.Y.1982). No such affirmative defense was raised here.

7. Even absent the filing of an objection to a plan of reorganization, the proponent of a plan must affirmatively demonstrate that the plan is confirmable. *In re Williams*, 850 F.2d 250, 253 (5th Cir.1988); *In re Nikron, Inc.*, 27 B.R. 773, 777 (Bankr.E.D.Mich.1983). Therefore, regardless of whether a valid objection to confirmation has been asserted, the Bankruptcy Code imposes upon the court the responsibility of determining whether the requirements of 11 U.S.C. § 1129(a), and if applicable 11 U.S.C. § 1129(b), have been met.

8. The filing or voicing of an objection to a plan of reorganization does not shift the burden of proving that the plan satisfies all of the requirements of 11 U.S.C. § 1129(a) away from the proponent of the plan. 2 Robert E. Ginsberg, *Bankruptcy* § 13.11 (2nd ed. 1989).

A. *Best Interests of Creditors Test*

9. (a) to satisfy the requirement of 11 U.S.C. § 1129(a)(7), all claimants in a class of claims which is impaired under the proposed plan of reorganization must be accorded treatment under the plan at least as good as treatment which they would receive upon the liquidation of the debtor under Chapter 7 of the Code, unless all such claimants accepted the plan. *In re Featherworks Corp.*, 25 B.R. 634, 639 (Bankr.E.D.N.Y.1982), *aff'd*, 36 B.R. 460 (E.D.N.Y.1984). It was therefore the burden of Rusty Jones to prove that the Class 5 creditors, an impaired class in which many of the members did not accept the Plan, would receive or retain property under the Plan on account of their claims that had a value, as of the effective date of the Plan, not less than the amount that such claimants would receive if Rusty Jones were liquidated under Chapter 7 of the Code on such date. However, from the recent hearing, it is impossible on the basis of the evidence before the Court to determine the amount that Class 5 creditors would actually receive in a Chapter 7 liquidation.

(b) Rusty Jones did not present plausible evidence as to the value of its accounts receivables or its trademark. The evidence as to the value of Rusty Jones' inventory (and its supposed cost of liquidation) was incomplete and presented in a self-serving and contradictory manner. (The inventory is said to be sufficiently old that it has no resale value in a liquidation, but rather will cost approximately $450,000 to be disposed of. On the other hand, if the Plan is confirmed, Rusty Jones contemplates that essentially all of this same aged inventory will be sold or used pursuant to the ECP agreement. Further, the interest of prospective buyers interested in the inventory was not explored.) In addition to being unable to value Debtor's assets in liquidation, for purposes of this hearing Debtor's estimate of the professional fees incurred was reduced by the Court by $50,000. Finally, some costs totalling $175,000 that Debtor counted against the liquidation would also be paid out of available assets if the Plan were confirmed. Accordingly, even before analysis of the Beatrice litigation, Debtor has failed to show that the Plan meets the requirements of 11 U.S.C. § 1129(a)(7).

(c) Further, Rusty Jones did not establish, for tax or any other reasons, that it would meet the requirements of § 1129(a)(7) for the Class 5 creditors to receive only 80% and not 100% of the proceeds, if any, recovered from the Beatrice litigation. Assuming that such a recovery occurs, the larger its size, the greater the disparity between what the Class 5 creditors would receive in liquidation as opposed to their receipts under the Plan. Rusty Jones' proposal to give the Class 5 creditors only 80% of the net proceeds of the litigation from Beatrice, in the context of the rest of the Plan, violates 11 U.S.C. § 1129(a)(7). Indeed, the question of con-

firmation is not even close because of this element of the Plan. Even if all other deficiencies were absent, this element alone would sink the Plan. The argument that 80% of recovery is at least as good at 100%, seriously advanced by Debtor and both Creditors Committees, was frivolous. The Court finds and concludes because of this element that the Plan does not in fact or law meet the requirements of § 1129(a)(7).

### B. *Feasibility of the Plan*

■ 10. (a) The Code requires that for a plan of reorganization to be confirmed, confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization." 11 U.S.C. § 1129(a)(11). On the basis of the evidence presented, the Court cannot conclude that the confirmation of the Plan (which does not propose liquidation or further financial reorganization) is not likely to be followed by liquidation or the need for further financial reorganization of Rusty Jones.

(b) As previously discussed, Rusty Jones' proposed budget for the five years following confirmation depends upon both an income stream from the ECP Agreement and the speedy collection of the outstanding accounts receivable. The ECP Agreement, however, does not guarantee Rusty Jones money, but rather provides that if ECP makes money, a certain percentage will be remitted to Rusty Jones. The testimony of Wortman indicated that to be successful, an ongoing working relationship between ECP and Rusty Jones was necessary, and that this relationship had to be carefully nurtured. Rusty Jones current management lacks expertise in this field, making the projected income stream from the ECP Agreement speculative at best.[3]

(c) In addition, there was no evidence presented in support of Debtor's projections as to the timing or the amounts of any collection of the outstanding accounts

---

**3.** The evidence as to whether Rusty Jones' inventory was usable was conflicting. If it was not useable by ECP, then under the ECP Agreement it would be returned to Rusty Jones who would ultimately be responsible for its disposal.

This cost, estimated at $450,000, is not accounted for in the budget. The Findings cast doubt on validity of the $450,000 estimate, but if it were valid then reorganized Debtor would be sunk by this environmental clean-up torpedo.

receivable. It is therefore impossible to evaluate this essential component of the post-confirmation budget.

(d) Finally, given the prior conduct and lack of experience in Rusty's business of the persons who both control Rusty Jones and would constitute its proposed future management, there can be no assurance of proper management in the future. Accordingly, Debtor has not proved that the Plan meets the requirement of 11 U.S.C. § 1129(a)(11).

### C. *Lack of Good Faith*

■■■■ 11. (a) In determining whether a plan of reorganization has been proposed in good faith and not by any means forbidden by law within the meaning of 11 U.S.C. § 1129(a)(3), the central inquiry is whether the plan will fairly achieve a result consistent with the objectives and purposes of the Code. *In re Madison Hotel Associates,* 749 F.2d 410, 424–27 (7th Cir.1984). The fundamental purpose of Chapter 11 is to enable a distressed business operation to reorganize its affairs in order to prevent the loss of jobs and the adverse economic effects associated with disposing of assets at their liquidation value. *See, e.g., NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). The instant proposed Plan does not serve that purpose. Rather, as outlined earlier, the Plan serves to an unacceptable extent as a vehicle for the personal profit of "investors" who purchased the Debtor for $1.00 and since sought to operate it in bankruptcy for their personal benefit and contrary to the interests of creditors. That Plan would provide for them 20% of any net Beatrice recovery, large future earnings, and some cash (estimated at $94,000) as operating capital. It also provides significant but less than legally sufficient amounts for the unsecured creditors.

(b) For reasons set forth herein and in the Findings of Fact, and in the context of the history of this case, the present Plan has not been proposed in good faith and does not meet the requirement of 11 U.S.C.

§ 1129(a)(3). Indeed, Debtor has not proved that the Plan complies therewith.

### D. *Officers and Directors*

■■ 12. Section 1129(a)(5)(A) provides in part that the proponent of the plan must disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director or officer of the debtor and that "the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors ... and public policy." For reasons set forth in the Findings of Fact, the continuance in office of the individuals proposed to serve after confirmation of the Plan as directors and officers of Rusty Jones is not consistent with the interests of either the present or future creditors of Rusty Jones. Accordingly, the Debtor has not proved that the Plan meets the requirements of 11 U.S.C. § 1129(a)(5).

### E. *Other Objections*

■■ 13. Beatrice Foods raised a further objection that the bankruptcy case was filed in bad faith. The concept of good faith as a prerequisite for filing a Chapter 11 case was discussed in *In re Winshall Settlor's Trust,* 758 F.2d 1136, 1137 (6th Cir.1985), which stated:

> Factors relevant in examining whether a Chapter 11 petition has been filed in good faith include whether the debtor has any assets, whether the debtor had an ongoing business to reorganize, and whether there was a reasonable probability of a plan being proposed and confirmed.

Judge Barliant of our Bankruptcy Court has recently explained that Chapter 11 was designed by Congress to prevent waste and reduction in assets that result from unnecessary litigation, and that the good faith standard is the bankruptcy court's equitable mechanism for assuring that a Chapter 11 case has at least the potential to serve those purposes. *In re Schlangen,* 91 B.R. 834, 837 (Bankr.N.D.Ill.1988). Primarily because the Court finds it likely that Debtor can still confirm a Plan in Chapter 11, that objection of Beatrice Foods is overruled.

14. Remarks of the Court at the conclusion of the hearing on January 19, 1990 and any conclusions of law which are contained in the Findings of Fact will stand as additional Conclusions of Law.

## CONCLUSION

15. For reasons set forth in the Findings of Fact and Conclusions of Law, confirmation of the Plan will by separate order be denied. The ECP Agreement was approved conditional upon confirmation of the Debtor's Fourth Amended Plan. Since that Plan will not be confirmed, the prior order approving that Agreement will now be vacated. A separate order to that effect will now be entered.

APPENDIX 1

RUSTY JONES, INC.
PROJECTED LIQUIDATION STATEMENT
AS OF JANUARY 15, 1990
DEBTOR EX. # 1

| | |
|---|---:|
| Cash and Cash Equivalents | |
| December 31, 1989 balance | $1,530,313 |
| Interest December 31 to January 15 | 5,000 |
| Deposits | 11,848 |
| Employee Receivables (1) | 7,517 |
| Accounts Receivable (1) | 150,647 |
| Notes Receivable — American National Bank | 18,200 |
| — Training Consultants, Inc. (1) | 6,500 |
| Inventory (1) | 14,000 |
| Furniture, Equipment & Vehicle (1) | 17,500 |
| Prepaid Insurance | 0 |
| Trademark (1) | 50,000 |
| Total Proceeds Available Upon Liquidation | $1,811,515 |
| Less: | |
| Cost to fund company (December 31 to January 15) | $ 20,000 |
| Post–Petition Payables | 27,000 |
| Cost to dispose of leases | 11,000 |
| Professional and Administrative Costs — Chapter 11 (2) | 543,087 |
| Cost to dispose of inventory (1) | 450,000 |
| Chapter 7 costs (3) | |
| — Trustee fees | 55,000 |
| — Legal fees | 50,000 |
| — Notice costs | 164,000 |
| — Distribution costs | 125,000 |
| Funds Available to be Distributed to Creditors | $ 366,438 |

### NOTES TO PROJECTED LIQUIDATION STATEMENT:

All items other than those marked with the following notes are being supplied by management.

(1) This item is based on Valuation Counselor's, Inc. report dated August 14, 1989. Some Valuation Counselor items have been adjusted by management for subsequent events (e.g. partial payments, reduced bids for equipment, etc.).

(2) [This figure is based on an] "Analysis of Professional and Administrative Costs" [prepared by Debtor].

(3) Trustee Fees are equal to 3% of total liquidation proceeds. Notice Cost includes two direct mailings to only those warranty holders who filed a timely claim, and does not including amount for public notice. Distribution Costs are included on the basis of 250,000 claimants and $0.50 per claimant.

APPENDIX 2

(000'S $ OMITTED)

RUSTY JONES, INC.
PROJECTED INCOME AND CASH FLOW
FIVE YEAR PERIOD

| REVENUE SOURCES: | 1 | 2 | 3 | 4 | 5 | CUMULATIVE TOTAL |
|---|---|---|---|---|---|---|
| LICENSEE/DISTRIBUTOR | 31 | 97 | 223 | 409 | 655 | 1,415 |
| LICENSEE/FRANCHISER | 0 | 13 | 50 | 128 | 241 | 432 |
| TOTAL | 31 | 110 | 273 | 537 | 896 | 1,847 |
| EXPENSES: | | | | | | |
| GENERAL AND ADMINISTRATIVE | (180) | (191) | (204) | (220) | (240) | (1,035) |
| NET PROFIT (LOSS): | (149) | (81) | 69 | 317 | 656 | 812 |

STATEMENT OF PROJECTED
CASH FLOW

| | 1 | 2 | 3 | 4 | 5 | CUMULATIVE TOTAL |
|---|---|---|---|---|---|---|
| Projected Beginning Cash | 94 | 45 | 19 | 88 | 405 | 94 |
| Net Profit (Loss) | (149) | (81) | 69 | 317 | 656 | 812 |
| Pre–Petition Accts. Rec. | 100 | 55 | N/A | N/A | N/A | 155 |
| ENDING CASH | 45 | 19 | 88 | 405 | 1,061 | 1,061 |