**In re RUSTY JONES, INC., Debtor.**

**Bankruptcy No. 88 B 18708.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

Dec. 9, 1991.

Norman Newman, Much Shelist Freed Denenberg Ament & Eiger, P.C., Chicago, Ill., for debtor.

Malcolm M. Gaynor, A. Daniel Feldman, Schwartz, Cooper, Kolb & Gaynor, Chicago, Ill., for Much Shelist Freed Denenberg Ament & Eiger, P.C.

James Carmel, Carmel, Baker & Marcus, Chicago, Ill., for Creditors Committee.

Dean Harvalis, Office of the U.S. Trustee, Chicago, Ill., U.S. Trustee.

Karen Goodman, Robert Nord, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for Distributors Committee.

Glenn R. Heyman, Dannen, Crane, Heyman & Simon, Chicago, Ill., for Creditors Trustee.

## AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION AND RULING ON FEE APPLICATIONS FOR COUNSEL FOR DEBTOR

JACK B. SCHMETTERER, Bankruptcy Judge.

### INTRODUCTION

In a bankruptcy case with an unhappy past,[1] one more unhappy issue has been presented. Debtor's counsel Much, Shelist, Freed, Denenberg, Ament & Eiger, P.C. ("Much Shelist") filed a final application for allowance of compensation and reimbursement of expenses. Also pending before the Court is the third interim fee application of Much Shelist. Through its final fee application, Much Shelist seeks compensation for services rendered in the total amount of $591,529.50 and reimbursement of expenses totalling $43,283.23. To date, Much Shelist has been paid $224,769.60 in fees and $28,011.58 in expenses.

---

1. For a factual background of this Chapter 11 proceeding, see this Court's opinion denying confirmation of Debtor's Fourth Amended Plan of Reorganization *In re Rusty Jones, Inc.,* 110 B.R. 362 (Bankr.N.D.Ill.1990), as well as this Court's opinion denying Debtor's motion for summary judgment on its motion to employ its three insiders, 109 B.R. 838 (Bankr.N.D.Ill. 1989). Further background is provided in this Court's opinion overruling Debtor's objections to the motion of the Distributor's Creditors' Committee to retain counsel. 107 B.R. 161 (Bankr.N.D.Ill.1989). This court takes judicial notice of its prior orders in this case, and incorporates them by reference into these findings.

The Creditor's Grantor Trust, the Distributors' Committee, and the U.S. Trustee all object to specific items in Much Shelist's fee applications for failing to meet the recognized standards for the granting of fees. See *In re Wildman*, 72 B.R. 700 (Bankr. N.D.Ill.1987). The U.S. Trustee also seeks total denial of all compensation, disgorgement of fees already received, and disqualification of Much Shelist from representing Rusty Jones in its litigation with Beatrice Companies, Inc. ("Beatrice") based on Much Shelist's alleged conflicts of interests in this case. For reasons that follow, the Court orders Much Shelist to reimburse $130,557.93 to the estate within 21 days hereof, and its application for payment of other and further fees and reimbursement of expenses is entirely denied. However, the objection of parties in interest to continued service of that firm as special litigation counsel in the pending District Court *Beatrice* litigation is denied.

Following the hearing held, from the record and all evidence presented by stipulation and otherwise, the Court entered Findings of Fact and Conclusions of Law on October 21, 1991. The need for certain changes in the dollars applicable to portions of the Opinion has since been called to the Court's attention. The Court now withdraws and vacates those earlier Findings and Conclusions, and now makes and enters Amended Findings of Fact and Conclusions of Law pursuant to Much Shelist's motion to reconsider and the U.S. Trustee's motion to modify the earlier decision.

## FINDINGS OF FACT

1. Rusty Jones, Inc. ("Debtor") filed a voluntary petition on December 5, 1988 in the Northern District of Illinois under Chapter 11 of the Bankruptcy Code. It operated as a Debtor–In–Possession until confirmation of the Debtor's Fifth Amended Plan of Reorganization on March 12, 1990.

2. On December 12, 1988, this Court entered an order authorizing the Debtor to employ James Chatz, Norman Newman, Morrie Much, Deborah Thorne, and John Ward as well as the law firm of Much Shelist, and other attorneys and paralegals of that firm to be counsel for the estate.

3. The Debtor's Application to Employ Much Shelist stated that the firm and its attorneys were disinterested. The application also included affidavits of Norman Newman ("Newman") and James Chatz ("Chatz"). Both affidavits are identical in content and recite that Chatz, Newman and Much Shelist had no connection with Debtor, or with any of the Debtor's creditors, or any other party in interest in the case, or with any of their respective attorneys except that Much Shelist represents the Debtor. The affidavits further stated that Much Shelist represented no interest adverse to the Debtor in this case or in the Debtor's estate in the matters in which Much Shelist was engaged.

4. On February 9, 1990, this Court denied confirmation of the Debtor's Fourth Amended Plan of Reorganization finding that "the Plan serves to an unacceptable extent as a vehicle for the personal profit of 'investors' who purchased the Debtor for $1.00 and since sought to operate it in bankruptcy for their personal benefit and contrary to the interests of the creditors." *In re Rusty Jones*, 110 B.R. 362, 375 (Bankr.N.D.Ill.1990).

5. Subsequent to the denial of confirmation of Debtor's Fourth Amended Plan, the U.S. Trustee moved for the appointment of a Chapter 11 trustee. In response, the Debtor proposed a modified plan which was discussed with the various parties in this proceeding, including the Committee of Warranty Claims Holders and the Committee of Distributors Claims Holders. What emerged was a liquidating plan in that all of the assets of the Debtor were transferred to a liquidating trust for the benefit of creditors and all interests of the Debtor's shareholders were eliminated. Under the Fifth Amended Plan, the trustee's duties were virtually identical to the duties of a Chapter 7 trustee. The Court approved confirmation of the Fifth Amended Plan, and the trustee of the liquidating trust is proceeding with the administration of the trust pursuant to the terms of the plan.

6. James Chatz, who was the Rusty Jones lead bankruptcy counsel, had close relationships, both on a personal and business level, with Donald Grauer ("Grauer") and Jeffrey Grossman ("Grossman") who were indirect controlling owners of the Debtor.[2] No facts concerning these relationships were ever disclosed by Chatz or Much Shelist to the Court when they applied to be Debtor's counsel, nor from that time until after the Fifth Amended Plan was confirmed. These facts came to light only through the extensive efforts of the U.S. Trustee's office. The following facts indicate the depth and extent of these relationships:

a. Chatz has been and remains a personal friend of both Grauer and Grossman since before 1970. Grossman and Grauer have attended Chatz family functions and the families have vacationed together.

b. Chatz has invested in numerous projects with either Grauer, Grossman, or both, including a hot dog stand (which closed in 1972); a limited partnership in a cable television concern; a company which owned delicatessens (Chatz's firm did the legal work on this investment); and the purchase and subsequent sale of property in Northbrook, Illinois and condominiums in Vail, Colorado.

c. In 1982, Chatz, Grauer, and Grossman formed the 3105 MacArthur Partnership and acquired the property at that address in Northbrook. The purchase was funded by a loan which was guaranteed by Grossman and Grauer. This partnership stills owns that property, and Chatz has a 5% ownership interest in the partnership.

d. In 1985, Grauer and Chatz together received unsecured loans of $75,000 each from Mount Prospect State Bank. The loans were apparently used to finance their continued ownership of the 3105 MacArthur Blvd. property. The loans were facilitated through Grossman's connections with a loan officer who was originally introduced to him by Chatz. Grossman was present at the loan negotiations. Later, in litigation with the bank, Grossman offered to pay the balance on these loans to settle the claim against him. However, Chatz repaid his loan by himself six weeks before Rusty Jones filed its Chapter 11 petition.

e. In 1985, Chatz, Grauer, and Grossman unsuccessfully attempted to purchase a shopping mall in Chicago together.

f. Chatz's children and Grauer's children have purchased and subsequently sold buildings in Wilmette, Illinois and Glencoe, Illinois together and shared in the profits.

g. Grauer has from time to time loaned Chatz sums of money for his personal use. As of December 5, 1988 (the date of Debtor's bankruptcy filing), Chatz owed Grauer approximately $10,-000, and as of November 13, 1990, Chatz owed Grauer $12,000. The total amount of loans made at any time by Grauer to Chatz aggregates about $50,000.

h. In 1985 or 1986, Chatz, Grossman and Grauer borrowed approximately $75,000 from the First Midwest Bank of Waukegan. The funds were used in the 3105 MacArthur Partnership. Final payment on the loan was made in late 1990.

7. Chatz has also worked professionally with both Grauer and Grossman. Chatz has represented them, their businesses, and has worked with them on bankruptcy matters, both before, during, and after the Rusty Jones proceedings. The following is a list of matters on which he did professional work for them:

a. Chatz started representing Grossman in isolated matters in 1975 while at the firm of Chatz, Sugarman & Abrams.

b. Chatz represented Grauer in a variety of personal matters including a lien dispute concerning Grauer's residence, the preparation of his will, the purchase and sale of real estate.

c. In April, 1985, Chatz was appointed as trustee in two related Chapter 7 proceedings, Brokers Capital, Ltd. (85 B 4842) and First LaSalle Services, Inc. (85 B 4841). Chatz caused his counsel to file

---

**2.** For an explanation of the ownership structure of Rusty Jones, see *infra* n. 4.

motions in both cases seeking to retain Grauer as the trustee's accountant, which motions were granted.

d. Grossman was the Chairman of the Board of North American Group Limited, which was formed to fund plans of reorganization in two Chapter 11 cases pending in Madison, Wisconsin.[3] North American was represented in these cases by a law partner of Chatz. His firm (Antonow & Fink) received over $106,000 for its representation of North American.

e. In 1988, two of the subsidiaries of North American, Pioneer Business Forms and Woehrmyer Business Forms, filed Chapter 11 petitions. Grossman asked Chatz to monitor the sale of Pioneer's assets, and Chatz represented North American, a secured creditor, in a hearing on the sale of Pioneer's assets.

f. Chatz and Newman joined Much Shelist on September 1, 1988, and that same day, Much Shelist's employment as Debtor's counsel in the Woehrmyer case was approved by the bankruptcy court. Chatz filed an affidavit with his employment application in the latter case which was identical to his affidavit filed in this case. Woehrmyer's assets were sold in June, 1989.

g. Much Shelist represented North American Equities (a subsidiary of North American Group and the lessor to Debtor while it was at 55 W. Monroe, Ste. 3500) in litigation with its lessor at 55 W. Monroe.

h. During June of 1990, Chatz served as the assignee for the benefit of creditors in two related companies, Bio Genetics and Professional Health Care Services. While operating those companies, Chatz retained Grauer's son, Jordan, to be his full-time associate. Later, the assets of the companies were sold, and one of the members of the purchasing group was known by Chatz to be an associate of Grossman.

8.a. Mr. Newman also had professional connections with Grauer and Grossman through his relationship with Mr. Chatz. Newman met Chatz when they both were at Lord, Bissell & Brook. Newman joined Antonow & Fink three months after Chatz, and both joined Much Shelist as Partners on the same day.

b. In September, 1987, Systems for Health Care, another North American subsidiary, filed a Chapter 11 petition. Several of the principals in Systems for Health Care filed bankruptcy petitions as well. Newman represented North American and monitored the principals' bankruptcies in an attempt to collect North American's debt.

---

3. The ownership structure of the "North American" group of companies follows:

Grossman is a general
partner in

**North American Preferred Partnership**
which owns 57.1% of the common stock
and 100% of the preferred stock in

**North American Group Limited**
which owns 100% of the common stock in both

| | | |
|---|---|---|
| North American, Venture (which formerly owned business known as Systems for Health Care) | and | North American Acquisition which owns 100% of |
| North American Equities (which was the lessee and sub-lessor to Rusty Jones at 55 W. Monroe, Ste. 3500) | | Pioneer Holding Company which owns 100% of the common stock in both |
| | | Pioneer Business Forms and Woehrmyer Business Forms |

c. In January, 1990, Newman handled a lease dispute for Internal Design, a company owned by Grossman's wife.

9. Many business and professional connections are significant in analysis of contentions as to conflict of interest: that Chatz was in debt to Grauer at the time of the Debtor's bankruptcy filing; Chatz's 5% ownership interest in the 3105 MacArthur Blvd. property; and Much Shelist's representation of North American in the Pioneer and Woehrmyer bankruptcies and in the lease dispute concerning the property at 55 W. Monroe Street. The long list of other connections between Chatz and Grauer and Grossman, demonstrates that Chatz and the two investors had a longstanding personal friendship and both a business and social relationship. Collectively they help flesh out the significance of relationships that bear on the asserted conflict.

10. Much Shelist's involvement with the Debtor began when Charles Wortman came to Chatz with the idea of acquiring the Rusty Jones. Chatz introduced Wortman to Grauer, Grossman, and Knopfler. Joseph Matz, a friend of Chatz, officially represented Renaissance Capital. However, Much Shelist performed the legal services incident to the acquisition. Morrie Much, a senior partner with Much Shelist, incorporated Rustco and Renaissance Holdings.[4] Also, Chatz was listed as the registered agent for Renaissance Holdings and Rustco.

11. Chatz was the "billing partner" for all matters relating to Rusty Jones, Renaissance Capital, Rustco Holdings, and Renaissance Holdings. This meant that he was to get credit for the collections arising from billable hours of Much Shelist attorneys for work on these matters, and it certainly meant that he was aware of all work performed by the law firm on those matters.

12. Much Shelist received a $12,200 payment for its services in the acquisition and a $125,000 retainer to represent Rusty Jones in a Chapter 11 proceeding. Payment was made with a check drawn from Rusty Jones' account. The $12,200 payment was never disclosed to the Court until August 15, 1990 in a supplement to its final fee application.

13. On the same day as the acquisition, Chatz and the owners of Rusty Jones planned strategies for the company's impending bankruptcy filing including retainers for Much Shelist and the Management Agreement, and Wortman was made President of Rusty Jones.

14. The Management Agreement ("Agreement") was a scheme of the owners which called for all the employees of the Debtor to be laid off and the responsibilities of running the company to be shifted to Renaissance Capital. Grauer set the hourly rates for personnel hired by Renaissance Capital to perform services for the Debtor, and he adjusted the rates upward by 10% to cover costs and create a profit. Pursuant to that Agreement Debtor paid $275,000 to Renaissance Capital on the eve

---

**4.** Rustco and Renaissance Holdings were formed for the acquisition of Rusty Jones. Control and stock ownership pertaining to Rusty

Knopfler, Grauer, and Grossman own 100% stock in

Jones during the periods of time mentioned in the opinion is described in this chart:

Renaissance Capital, Ltd.
which owns 100% stock in

Renaissance Holdings I, Inc.      and      Wortman
which owns 60% stock in                    who owns 40% stock in

Rustco Holdings, Inc.
which owns 100% stock in

Rusty Jones, Inc.

of filing its petition for relief under Chapter 11 of the Bankruptcy Code. The Agreement was found by the Court, in the opinion denying confirmation of the Debtor's fourth plan, clearly contrary to interests of the estate and its creditors. 110 B.R. at 367. The Agreement was entered into two weeks before the bankruptcy filing. Chatz participated in the creation of the Agreement although Matz officially represented Renaissance in drafting it. The Debtor, through Much Shelist, moved for authorization to assume the Agreement. However, after questions were raised by the U.S. Trustee and the Court, the motion was withdrawn. Renaissance Capital subsequently returned $179,744 of the $275,000 it received from the Debtor, as required by an order of the Court.

15. Matz was paid a $25,000 retainer following the negotiations concerning the acquisition and Management Agreement, immediately prior to the Chapter 11 filing. Payment was made with a check drawn on Rusty Jones' account.

16. After the effort to obtain approval of the Management Agreement aborted, Grossman and Grauer sought to put themselves and their associates on the Rusty Jones payroll. Chatz advised that they could simply be placed on the payroll.[5] However, Wortman and Knopfler preferred a court order, so a motion was prepared by a Much Shelist associate. The motion did not disclose any connections between Much Shelist and Grauer and Grossman.

17. The Application to Approve the Employment of Grossman, Grauer, and Knopfler was filed in April, 1989. The filed version of the motion was not shown to Wortman, and this motion was objected to on the same grounds as the Motion to Assume the Management Agreement. This Court found the expensive terms and substance proposed by the motion so one sided and unhelpful to the estate as to be "outrageous." Id. 110 B.R. at 368. Much Shelist was denied any compensation for its work on the motion because it did not benefit the estate at all. Id.

18. There were disputes among the owners of Rusty Jones, with Grossman and Grauer arguing over matters with Knopfler and Wortman. In these disputes, Much Shelist aligned itself with Grossman and Grauer.

a. In December, 1988, Knopfler reviewed the Renaissance Capital accounts and discovered many unexplained and questionable payments made to Grossman, Grauer, and their associates. He further became concerned over the excessive number of people hired under the Management Agreement and the value and legitimacy of the charges made by Renaissance Capital to the Debtor under the Agreement. Knopfler told Grauer and Grossman that he wanted to dissolve the Renaissance partnership. In response, Grauer had Morrie Much draft a redemption agreement which would force Knopfler to sell his share of the partnership to Grauer and Grossman. The agreement was drafted, but Knopfler refused to sign it.

b. In February, 1989, Grossman sought to have his associate, Kravitt put on the Rusty Jones payroll. Wortman refused, but he ultimately consented to hiring Kravitt to work with Much Shelist as an "analyst" to assist the firm in reviewing documents in the Rusty Jones litigation against its former owner, Beatrice.

c. In the fall of 1989, Wortman met with Grossman, Grauer, and Chatz to discuss the proposed plan of reorganization. Wortman argued with Grossman and Grauer concerning the propriety of using Grossman and Grauer's associates as independent contractors and the allocation of Rusty Jones' remaining cash reserves to a proposed Creditor Trust. Chatz sided with Grossman and Grauer

---

5. The propriety of this advice is questionable at best. Grossman, Grauer, and the others were to do the same tasks that they contracted to perform under the Management Agreement. However, it was clear from the Motion to Assume the Agreement that the services rendered by these people was professional in nature and not merely ministerial. Thus, it should have been clear that a motion to employ them was necessary.

in this dispute. Ultimately, Wortman was to testify against this plan in court.

d. In January, 1990, Wortman and Knopfler met with Grossman and Grauer to discuss distributing Renaissance Capital's shares of Rustco among Renaissance's three principals. Wortman believed that the shares would be distributed but he received no assurances. Therefore, Wortman consulted private counsel, Sheldon Solow, Esq. Mr. Solow made various proposals for the future management of the Debtor including bringing on a "blue ribbon" trustee or CEO. The proposals were rejected, and Wortman resigned his position as President.

e. Also in January, 1990, Knopfler asked that his share of the Rustco stock be distributed to him. In response, Grossman and Grauer had Morrie Much draft a sale of stock agreement allowing Grossman and Grauer to purchase Knopfler's shares. Much gave a copy of the draft to Knopfler's attorney and then revised it in response to that attorney's comments. However, there was presented no evidence that this agreement was ever signed.

19. In mid-June, 1989, the Debtor's principal place of business was moved from 6200 N. Hiawatha in Chicago to 55 W. Monroe St., Suite 3500, also in Chicago. The suite was leased to North American Equities, and the Debtor paid monthly rent to North American based on an oral lease. Based on Chatz's advice, the move was made without court approval. This move saved the Debtor $30,000 per month by reducing monthly rent from $33,000 at the Hiawatha location to $3,000 at the Monroe location. However, given Grossman's ownership of North American, the propriety of making this move without court approval was questionable.

20. It appears that an even better leasing arrangement could have been worked out for the Debtor. Wortman basically worked out of his home, so there was only one Rusty Jones employee at the Monroe location (Lynn Refer, who was simulta-

neously Rusty Jones' Vice–President and an employee of Grossman for work done on the Pioneer and Woehrmyer bankruptcies). While Rusty Jones was in this suite, the location housed Renaissance Capital, Grossman, Grauer, North American, Woehrmyer Business Forms, other Grossman related entities, and the law firm of Engerman and Brown. The total rent for the suite was $22,000 per month. Thus, it appears that Rusty Jones was paying for an undue percentage of the underlying lease.

21. On October 25, 1989, Mr. Chatz was suspended for one year from the practice of law.[6] The evidence is unclear concerning Chatz's participation in the bankruptcy proceedings after this date. Following his suspension, he was kept informed about the case by his partners at Much Shelist, but it has not been established that he participated in meetings of Debtor's counsel and strategy sessions while under suspension.

22. In November, 1989, Rusty Jones was moved from 55 W. Monroe to 3105 MacArthur Blvd. in Northbrook and remained there until confirmation. The decision to move was apparently made in Mid–October when Grossman and Grauer learned that a tenant was vacating the latter property. Refer surveyed other locations and determined that the MacArthur location was the least expensive property obtainable. However, no business purpose was served by the move. The only reason given for this move was that North American was abandoning its lease at Monroe. A reason not disclosed was the fact that Messrs. Chatz, Grauer and Grossman owned the MacArthur property. Finding No. 6(c). Monthly payments by Debtor were made according to an oral, month-to-month lease. Rusty Jones was given $9,430 bill for moving but the bill was never paid. Wortman was only told of the move by a phone call from Refer. No court approval was ever sought for this move.

23. Morrie Much learned of Chatz's interest in the MacArthur property in Decem-

6. For details of the suspension, see *In re Chatz,* 131 Ill.2d 499, 546 N.E.2d 613 (1989).

ber, 1989. However, the connection was first revealed to the Court through the U.S. Trustee's objections to Much Shelist's third interim fee application in April of 1990.

24. When the fourth amended plan of reorganization was heard, several attempts were made by Debtor's counsel to structure and even manipulate evidence artificially in order to achieve confirmation:

a. An expert was called by the Debtor to testify on the value of Rusty Jones' accounts receivables, but he had not examined the contract made with Dun & Bradstreet to collect the receivables. Also, no evidence was offered from Dun & Bradstreet as to the likelihood of successfully collecting the receivables.

b. The same expert was called to testify as to the liquidation value of the Rusty Jones Trademark. This Court characterized the testimony as "a highly artificial effort by Debtor [to] demonstrate a low liquidation value so as to meet the requirements of 11 U.S.C. § 1129." 110 B.R. at 370.

c. At the hearing, Debtor's inventory was presented as an environmental problem and therefore something that would be very expensive to dispose of. The Debtor's management ignored potential purchasers of Rusty Jones' inventory despite the Distributors' Committee serving notice showing interest by prospective buyers. *Id.*

d. The attempt by the Debtor's principals to retain 20% of the possible proceeds from the Beatrice litigation was to be supported by a tax expert put on to show that the unsecured creditors would receive more money if they received only 80% of the *Beatrice* litigation proceeds because of the supposed tax consequences of receiving 100%. This argument was not supported by testimony of the expert, and was found by the Court to be frivolous and wholly unpersuasive. The firm of Ernst & Young were hired to explore the tax consequences of the 80/20 split, but they were not asked to explore the consequences of distributing 100% to the creditors. Also, counsel for the Creditors Committee was not invited to attend sessions with the Internal Revenue Service on this matter.

25. It is clear from this and earlier proceedings that Grauer and Grossman have controlled the Debtor at all times during the bankruptcy proceedings, and that they made several efforts to bleed Rusty Jones of its assets so as to benefit themselves to the detriment of the creditors. See *In re Rusty Jones*, 110 B.R. at 367. During the period described in these Findings, the interests of Grossman and Grauer diverged from interests of the estate of Debtor and its creditors.

26. It is also clear that attorneys at Much Shelist frequently behaved as if Grossman and Grauer, and not the Debtor, were their clients. They acted on several occasions to further the goals of Grossman and Grauer to the detriment of the Debtor's estate and its creditors. Much Shelist's work on behalf of Grossman and Grauer was ultimately unsuccessful, most wasteful of the time of all concerned, and costly to the estate. Ultimately, their work injured the other creditors by increasing costs of administration and delaying confirmation of a lawful plan.

27. One of the major assets of this Debtor is the potential damage award that it may receive from litigation with Beatrice. On September 18, 1989, Much Shelist moved for this Court to approve its retention as Debtor's counsel in this litigation, with nonbankruptcy litigation counsel to do the work. Under the order approving such retention, Much Shelist is to receive compensation based on a contingent fee arrangement. Much Shelist did not reveal to the Court any of its connections to Grauer and Grossman in making this motion.

28. The Court approved Much Shelist's motion to work on the *Beatrice* case on January 24, 1990. Delay between application and approval occurred because the Court deferred ruling on this matter to see if early settlement negotiations would be successful. Approval came when the negotiations failed and it was absolutely necessary that Debtor have counsel to pursue the litigation. To date, discovery is proceeding in that litigation, but there is no

basis in the record to anticipate an early resolution of that hotly contested case before the District Court. The *Beatrice* case is very complex and it would take many months of extensive effort for any new counsel for Debtor to learn the case file. All parties in interest except Beatrice itself told the court that this litigation is worth many millions of dollars.

29. Fact statements contained in the Conclusions of Law will stand as additional Statements of Fact. Any legal conclusions contained in the Fact statement will stand as additional Conclusions of Law.

## CONCLUSIONS OF LAW

1. This matter arises under 11 U.S.C. § 330. Accordingly, this Court has jurisdiction over the proceedings pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and is referred to this Court pursuant to Local District Rule 2.33.

2. This Court has engaged in a two part analysis of these matters. First, the fee applications were examined and determined as if there were no disqualification issue. In the first two sections of the ruling below, fees and expenses are provisionally allowed in part and disallowed in part. In the remaining sections below, the court has ruled that Much Shelist violated 11 U.S.C. § 327(a), § 328, Bankruptcy Rule 2014, and determined the appropriate consequences of the violations found.

## I. FEE APPLICATIONS

3. 11 U.S.C. § 330 governs compensation of professionals. It requires that professionals demonstrate in writing that their services were (1) actual; (2) necessary; and (3) reasonable. *In re Pettibone Corp.*, 74 B.R. 293, 301 (Bankr. N.D.Ill.1987). Once services have been performed, Bankruptcy Rule 2016 requires that:

A person seeking interim or final compensation for services or reimbursement of necessary expenses, from the estate shall file with the court an application setting forth a detailed statement of (1) services rendered, time expended and expenses incurred, and (2) the amounts requested.

The burden is on the applicant to demonstrate entitlement to fees. *In re Wildman,* 72 B.R. 700, 708 (Bankr.N.D.Ill.1987). This burden is not to be taken lightly, especially given that every dollar spent on legal fees results in a dollar less that is available to the estate and its creditors. *In re Pettibone,* 74 B.R. at 299.

4. This Court has responsibility to review and question applications for compensation, and to determine the reasonableness of fee requests. *In re Wildman,* 72 B.R. at 705. For fees to be awarded by this court, the application must supply the type of information set out in *In re Continental Illinois Securities Litigation,* 572 F.Supp. 931 (N.D.Ill.1983); *In re Wildman,* 72 B.R. 700; *In re Pettibone,* 74 B.R. 293. Much Shelist has organized its third fee request and also its final application into 21 different task categories based on different types of services rendered. Several parties in interest have objected to fees requested in a number of task categories. The Court is mindful of the need for specificity in justifying any denial of fees. See *McIlveen v. Stone Container Corp.,* 910 F.2d 1581, 1584 (7th Cir.1990) ("we again strongly request district courts to specify the costs which are being disallowed ... and to provide factual findings to support those disallowances"). Accordingly, each work category must be separately analyzed.

5. *General Administration (Category 1):* A total of 97.9 hours were billed in the third application and 33.8 hours were billed in the final application for general administration of the Debtor's case. Services rendered include meetings with representatives of the Debtor and other interested parties; telephonic and written correspondence with creditors, attorneys, and other interested parties; and other general matters. In the final application, this category also includes work done on motions to the use of Stat Tab (hired for the balloting in the confirmation process), the appointment of a Chapter 11 Trustee, and hearings on the ongoing expenditures of the Debtor.

6. The third application must be reduced in this category by $1,552. First, Michael J. Freed is billed at premium rates ($300 per hour) for matters of general administration. This rate may be appropriate for his role in the *Beatrice* litigation before the firm went on contingent fee basis, but it is unusual, unnecessary and inappropriate for matters of general bankruptcy administration. Moreover, he is a skilled nonbankruptcy litigator and there is some question as to why he worked on general administration of the case. Even resolving the latter question in favor of the applicant, Mr. Freed's hours in this category will be credited at a rate equal to that of most of his firm's bankruptcy partners, $200 per hour. Also, Mr. Chatz billed 3.7 hours at $260 per hour for "review" without explanation. This is inadequate information and such work is disallowed. If a lawyer seeks payments for work at the rate of $260/hour, an explanation of that work is in order. It is the burden of petitioning counsel to supply sufficient information to justify the requests for fees and expenses. See *In re Pettibone*, 74 B.R. at 301.

7. *Management Agreement (Category 2):* Much Shelist is not seeking any fees for services connected with the Management Agreement (Category 2 in their billing scheme) in the pending applications.

8. *Warranty Claims (Category 3):* In the two pending applications, 178.3 hours were billed in the third application and 13.7 hours were billed in the final application for work done on warranty claims. Most of these hours represent services rendered by paralegals in responding to telephone calls from warranty claimants, states' attorney general offices, and attorneys concerning the reorganization plan, possibility of distribution, and other information. Some time reported on the third application was also spent in meetings and discussions concerning procedures for dealing with warranty claims.

9. Several parties object that law partners were handling routine phone inquiries from the many warranty holders, and that attorneys should only have been employed to answer inquiries from law offices and other attorneys. This court agrees and finds it inappropriate that attorneys should be billing at partner rates to answer questions that could easily have been handled by paralegals given proper instruction. There are tens of thousands of warranty holders. The firm should have dealt with their calls in a more efficient manner. Therefore, the time spent by attorneys answering warranty holders' questions shall be compensated at paralegal rates. In the third application, Norm Newman billed 18.4 hours at $190 per hour, and John Ward billed 3.6 hours at $200 per hour for answering phones. The paralegals were billed at $65 per hour. Therefore, the third application is reduced by $2786. In the final application, Newman billed 5.5 hours at $200 and Ward billed 1.9 hours at $210. The paralegals were billed at $70 per hour. Thus, the final application is reduced by $981.

10. The Distributor's Committee and the U.S. Trustee argue that the fees should be reduced even more because Much Shelist should have set up a separate phone line with a recorded message that could have answered the routine questions. Under such a system, callers are greeted with a prerecorded message listing several subject options that can be selected on a push button phone. If none of the initial options serve the caller, an option is given to request someone to talk to. Similar devices are already widely employed by many businesses to take messages from general callers. This technology is widely recognized as providing a high level of service at a low cost to the user. See Robert Wallace, *Voice Response Wins its Place in the Sun,* Network World, April 22, 1991, at. 13. However, while that may have been feasible here, it was decided that counsel could not adequately anticipate the many different questions so as to make a telephone recording meaningful. Certainly in every case where calls from large numbers of persons are anticipated, use of a phone service with a menu of choices available to the caller should be considered. But we will accept in this instance counsel's judg-

ment not to use the telephone service. Thus, while the decision not to use paralegals to answer the phones was not reasonable, Much Shelist will not be penalized for not setting up a recorded message. However, this Court notes for the future that attorneys may find unnecessary fees reduced for not utilizing this technology where there are large numbers of routine callers.

11. *Hiawatha Property (Category 4):* In this category 38.4 hours were billed in the third application for services rendered in connection with terminating its lease at Hiawatha Avenue. Much Shelist negotiated with the lessor, and as a result of their efforts, Rusty Jones was able to terminate its lease, and the lessor agreed not to file a claim for damages in connection with the rejection of the lease. Terminating this lease relieved the Debtor of a $33,000 per month obligation.

12. *Corporate—General (Category 5):* There were 11.9 hours billed in the third application and 17.5 hours were billed in the final application for services including a review of the Rusty's Place concept, tax issues, work on the Creditors Trust Agreement, and work on the Debtor's corporate records in connection with the confirmed plan.

13. *Litigation—General (Category 6):* A total of 21.6 hours were billed in the third application and 16.2 hours were billed in the final application for services rendered with regard to pending actions in which Rusty Jones was a party, including claims involving distributors and dealers.

14. *Wisconsin Bond Claim (Category 7):* There were 18.4 hours billed in the third application and 3.9 hours were billed in the final application for representing the Debtor in negotiations with Indiana Lumbermans, Safeco Insurance Co., and the Wisconsin Attorney General concerning the treatment of the Wisconsin warranty holders. The end result of those negotiations was that the confirmed plan provides a forum for the resolution of future anticipated litigation involving the respective rights and liabilities of Wisconsin warranty

holders, the bonding companies, and the Debtor's estate.

15. *Dealers (Category 8):* There were 11.9 hours billed in the third application for review of claims asserted against Debtor by the dealers and receivables owed to Debtor by the dealers.

16. There were no objections filed to the work done under work categories 4 through 8. The work in all these categories was reasonable and were of value to the estate. Therefore, the fees in these categories are provisionally allowed in full.

17. *Leases and Executory Contracts (Category 9):* There were 16.2 hours billed in the third application for services rendered to terminate Debtor's lease at 127 W. Huron St., Chicago. Debtor was able to reject this lease, and the lessor did not pursue any claims for Debtor's post-petition debt over and above the security deposit.

18. The U.S. Trustee objects to fees in this category because of Chatz's ownership interest in the 3105 MacArthur location. However, the Trustee's objections are misplaced here because the fees in this category only relate to the move of Rusty's Place from Huron Street to Clark Street, and not with the move of Rusty Jones' headquarters from Monroe Street to the MacArthur location.

19. *Retention of Professionals (Category 10):* A total of 5.2 hours were billed in the third application and 1.3 hours were billed in the final application for time devoted to pleadings and court appearances in connection with Debtor's motion for employment of counsel on the *Beatrice* litigation and in contesting the order employing the law firm of Hinshaw, Culbertson as counsel for the Distributors Committee.

20. The first objection to this work category is that Much Shelist did not reveal its conflicts of interest in applying to be Rusty Jones' counsel in the Beatrice litigation. This objection shall be discussed in the conflict of interest discussion below. The second objection to this category concerns the value of Much Shelist's efforts in appealing the order employing Hinshaw,

Culbertson as counsel for the Distributors' Committee. Hinshaw's employment was objected to because Hinshaw allegedly had a conflict of interest. Although wrong, the objection was marginally arguable. Therefore, compensation will not be fully denied for their efforts, and half of the fees concerning the appeal will be allowed in this category. This matter took up one hour in the third application and 1.3 hours in the final application, so a total of $176 will be deducted.

21. *Beatrice Suit (Category 11):* There were 418.3 hours billed in the third application and 161.5 hours were billed in the final application for work done prosecuting Rusty Jones' lawsuit against Beatrice Co. However, Much Shelist will credit any fees awarded in this proceeding against fees which it may receive under the contingency fee agreement.

22. The Distributors' Committee objects to this arrangement on grounds that Much Shelist should only be awarded fees pursuant to the Contingency Fee Agreement, and the Court agrees. The January 24, 1990 order allowing Much Shelist's employment as Debtor's counsel stated that "compensation to be paid ... shall be in accordance with the Contingency Fee Agreement." and that counsel shall only file fee applications for "reimbursement of out-of-pocket expenses incurred in the amount up to $100,000." The Contingency Fee Agreement in turn provides that counsel shall receive a percentage of the proceeds won in the litigation. There is a further provision which allows for Much Shelist to receive payment for fees on services performed before August 1, 1989. Thus, it is clear that Much Shelist can apply only for services performed before August 1, 1989 and must receive the remainder of its fees from any proceeds of the litigation. Thus, all the fees in category 11 of the final application must be disallowed, and only the fees for the month of April, 1989 ($1376.50) are allowed under category 11 of the third application.

23. *Fee Matters (Category 12):* There were 94.7 hours billed in the third application and 105.2 hours were billed in the final application for the preparation of Much Shelist's fee applications and for responding to objections. About 75–80% of the time billed was for work done by a paralegal.

24. The total fee claimed on all four applications in this category is $21,208.50, and the total fee requested for all work categories is $604,272.50. Thus, the Fee Matters category exceeds 3% of the total fee by about $3,500. While counsel should be compensated for necessary and reasonable time in preparation of fee applications, the present request for that work is excessive and unreasonable by that amount, since most fee applications can and are filed for time-value of about 3% of the total fee requested. While bankruptcy counsel must provide much detail and should be compensated for that work, they should also collate time as they go along and prepare to issue detailed bills efficiently, as must their colleagues in nonbankruptcy work who are not compensated for such preparation. Accordingly, $3,500 will be disallowed for the unreasonable and unnecessary work in this category.

25. *Plan of Reorganization (Category 13):* A total of 318.6 hours were billed in the third application and 413.2 hours were billed in the final application for work done preparing the Fourth and Fifth Amended Plans of Reorganization. As pointed out earlier, the Fourth Plan was rejected by the court and the Fifth Plan was confirmed on March 6, 1990.

26. All parties other than Debtor have objected to awarding Much Shelist all its fees in this category due to the complete failure of the fourth plan to be confirmed. The court agrees and will reduce the allowed fees.

27. In essence, Much Shelist argues that it should not be penalized in this complex case for attempting the difficult task of reorganizing the Debtor to allow it to continue doing business and keeping the case from being converted to Chapter 7. However, this court takes note of the firm's conduct in the confirmation hearing (see, *supra* Finding of Fact ¶ 24), the bad

faith in which this plan was presented, the injury to creditors and the estate caused by delay in reaching a confirmed plan, and the foreseeability of failure on legal grounds cited for denial of confirmation. *Cf.* 110 B.R. 362. It would add insult to injury to allow Much Shelist to receive full compensation for their work in this regard.

28. The court is inclined to deny fully all fees connected to the formulation of the fourth plan, but it also recognizes that a small part of the work done on the fourth plan contributed to the creation of the confirmed fifth plan. Therefore, the court disallows 80% of the billed hours spent on formulating the fourth plan and disclosure statement and allows all hours spent on formulating the fifth plan. This reduces the third application by $50,175 and the final application by $15,868.[7]

29. *Tax Matters and Sales of Assets (Categories 14 and 15):* There were 0.6 hours billed in the third application for review of tax issues connected to the plan of reorganization and for assisting the Debtor negotiate with its lessor at the Hiawatha location for an option to personal property.

30. There is no objection to those matters, and they are allowed in full.

31. *Distributor Claims (Category 16):* A total of 79.3 hours were billed in the third application and 12.5 hours in the final application for negotiating the settlement of distributors' Chapter 11 filing and drafting a settlement agreement. These claims were originally filed in an amount exceeding $35,000,000. In the settlement, the claims have been reduced and allowed in the approximate amount of $4,300,000. The settlement agreement was approved by order of this Court.

32. *Collection of Accounts Receivable (Category 17):* There were 55.3 hours billed in the third application and 15.8 hours were billed in the final application for time spent preparing, filing, and prosecuting adversary proceedings against various distributors to collect receivables owed by them.

33. There are no objections to the work done under categories 16 and 17. The work in these categories was reasonable and were of value to the estate. Therefore, the fees in categories 16 and 17 are allowed in full.

34. *License Agreement (Category 18):* There were 16.5 hours billed in the third application and 0.9 hours were billed in the final application for work done negotiating and obtaining court approval of the Debtor's licensing agreement with ECP Incorporated.

35. This work was reasonable so long as Much Shelist and the Debtor were working towards reorganizing the Debtor as a viable entity and not a liquidation. Furthermore, this agreement was urged by all of the Debtor's management because it was to be the Debtor's primary source of income after the reorganization. The fees in this category are thus provisionally allowed in full. The U.S. Trustee objects that this work was done by conflicted counsel primarily to benefit insiders. This ob-

---

7. On the third application, all the time billed was for the creation of the fourth plan, so the entire category ($62,719) was reduced by 80%. On the final application, all time from January 12, 1990 (the last day of the confirmation hearing) and earlier was added up and reduced by 80%. Below is a chart of each attorney's time spent on this matter in the final application:

| | | | | |
|---|---|---|---|---|
| Norm Newman | 55.3 Hours | @ | 200 = | $11060 |
| Claire Pennsyl | 14.4 Hours | @ | 180 = | 2592 |
| Deborah Thorne | 5.1 Hours | @ | 150 = | 765 |
| Morrie Much | 9.0 Hours | @ | 220 = | 1980 |
| Zane Michael Cohn | 0.4 Hours | @ | 195 = | 78 |
| David Epstein | 8.0 Hours | @ | 200 = | 1600 |
| Bruce Scalambrino | 11.0 Hours | @ | 160 = | 1760 |
| | | | | $19835 |
| | | | | × 80% |
| | | | | $15868.00 |

jection will be discussed in the conflict of interest discussion below.

36. *American National Bank (Category 19):* A total of 11.6 hours were billed in the third application and 8.1 hours were billed in the final application for negotiating and obtaining court approval of a settlement with American National Bank for return of $19,000 to Debtor after the bank honored pre-petition checks on post-petition Debtor accounts.

37. *Employment of insiders (Category 20):* The Court previously denied Much Shelist any fees for work done in connection with the Management Agreement, and also previously disallowed compensation for its work on the attempted employment of Grauer, Grossman, and other insiders under 11 U.S.C. § 1108. However, no fees are sought for these tasks in the current applications.

38. *Universal (Category 21):* There were 1.4 hours billed in the third application to resolve a dispute with a creditor (Universal) who had improperly set off funds against the Debtor.

39. There are no objections to the work done under categories 19 and 21. The work in these categories was reasonable and of value to the estate. Therefore, fees requested in categories 19 and 21 are provisionally allowed in full.

40. *6306 Clark Street (Category 22):* A total of 19.9 hours were billed in the third application and 1 hour was billed in the final application for negotiating and obtaining court approval for the lease at 6306 N. Clark St., Chicago and other matters concerning that location. The Debtor's rent at 127 W. Huron was 12,000 per month while the lease at Clark street was $5,500 per month.

41. This move was done pursuant to management's desire to keep the Rusty Jones trademark alive, and on advice of an expert in trademark law that such was necessary. For the same reason that the fees in Category 18 are allowed, the fees in this category are provisionally allowed in full.

42. *James Hollis Discrimination Charge (Category 23):* There were 0.3 hours billed in the third application for a Much Shelist partner's participation in a conference with the Illinois Department of Human Rights concerning a discrimination charge filed by a former employee of Rusty Jones.

43. There are no objections to the work done under category 23. The work in this category was reasonable and of value to the estate. Therefore, the fee in category 23 is provisionally allowed in full.

44. Thus, the total provisionally allowed fee for the third application is $101,705.50 and the total provisionally allowed fee for the final application is $92,088.50. The total fees requested in all prior and pending applications is $591,529.50, and Much Shelist has already received $224,769.60. As an initial matter, the total fees provisionally allowed are $428,368.50,[8] and in the ab-

---

8. The fees may be explained in the following way:

| Fee applied for: | |
| --- | --- |
| 1st Fee Application | $111,798.50 |
| 2nd Fee Application | 135,519.00 |
| 3rd Fee Application | 217,076.00 |
| Final Fee Application | 139,879.00 |
| Fees Previously Disallowed | (12,743.00) |
| Total Fees Requested: | $591,529.50 |
| Fees Disallowed from 3rd Application | (115,370.50) |
| Fees Disallowed from Final Application | (47,790.50) |
| Total Fees Allowed: | $428,368.50 |
| Initial Retainer | $125,000.00 |

sence of conflict of interest, the firm would now receive $203,598.90 [8] plus allowable expenses and less certain useless expenses that counsel instigated. (Conclusion Nos. 47 and 48.)

## II. EXPENSES AND OTHER PROFESSIONAL FEES

45. The combined out-of-pocket expenses claimed on the third and final applications is $15,271.70. Expenses are compensable only if they are not commonly treated as overhead. Overhead costs are built into the lawyers' and paralegals' hourly rate in fixing a profitable rate. *In re Wildman*, 72 B.R. at 731. Overhead includes "all continuous administrative or general costs or expenses incident to the operation of the firm which cannot be attributed to a particular client or cost." *In re Convent Guardian Corp.*, 103 B.R. 937, 940 (Bankr.N.D.Ill.1989), quoting *In re Thacker*, 48 B.R. 161, 164 (Bankr.N.D.Ill. 1985).

46. The Court deducts $12,754 for the following reasons:

a. Much Shelist asks for $14,583.25 in its applications for in-house photocopying expenses. The rate at which it charges in the third application, ($.15/page) is reasonable, but $.20/page requested in the final application is not reasonable. From the Court's experience in receiving thousands of fee applications, it is clear that most Chicago firms charge $.15/page or less for in-house copying, and commercial firms will copy the same materials for $.10/page. For six years, this Court has offered to allow attorneys to show that rates above $.15/page represent actual out of pocket expenses for in-house copying, rather than profits. If that were ever proved, a rate more than $.15/page would be allowed. In six

years, no one has thus established a higher rate as representing actual expense. Nor has the applicant. Therefore, only $.15/page will be allowed. However, the majority of this photocopying related to the fourth amended plan. Work related to that plan has been found improper and foreseeably wasteful. (Finding ¶ 24, Conclusion ¶ 27.) Therefore, this charge shall be reduced by 80% or $11,666.75.

b. The charges for court reporter fees ($757.75) has not been shown to be necessary or of value to the estate because it has not been shown that use of the transcripts benefited the estate. Those charges are entirely disallowed.

c. Costs for food at luncheon meetings are billed to the estate. However, lawyers and other persons involved in administration should pay for their own midday meals except when traveling out of town for the client. That is the customary practice among Chicago firms who have filed thousands of fee applications before this Court, and it will be applied here. Thus, the full $269.50 charged for food expenses is deducted.

d. The reasonable need and usefulness to the estate of secretarial overtime in this case was not demonstrated, and $60.00 is deducted.

47. (a) The Distributors' Committee and the U.S. Trustee ask that Much Shelist be made to reimburse the estate for fees paid to Valuation Consultants, Inc. ("VCI") and Ernst & Young ("E & Y"). VCI was paid $10,000 to prepare a valuation report for the Disclosure Statement and for a representative to testify at the unsuccessful fourth plan. E & Y was paid $144,683.89 for performing the accounting work for the estate. The work of both firms was part of Debtor's failed attempt to show that giving creditors 80% of any

| | |
|---|---|
| Pre–Bankruptcy Payment | $12,200.00 |
| Interim Fee Payments | 87,569.60 |
| Total Fees Received: | ($224,769.60) |
| Total Allowed and Outstanding Fees: | $203,598.90 |

proceeds from the *Beatrice* litigation would actually be more beneficial to them than receiving all the proceeds. At the confirmation hearing, the evidence did not support Debtor's argument that receipt by creditors of 80% of putative litigation proceeds was better for them than recovering 100% thereof. Much Shelist argues that E & Y proposed the tax theory underlying this approach, not it; therefore it objects to being penalized for this work. Much Shelist designed the Plan that rested on the tax theory, but the evidence at confirmation hearing showed that the E & Y tax theory clearly did not support the unlawful plan proposed in this case. In view of that evidence, it would not have been difficult for counsel to foresee that even with application of arcane tax laws, 80% of an expected multi-million dollar pie is not as much as 100%.

The services of VCI, and that part of the E & Y work related to plans of no value to the estate, were unnecessary to the administration of the estate; and much of that work was part of an attempt by Debtor with aid of Much Shelist to manipulate evidence to confirm the fourth plan, not useful or necessary to confirmation of any lawful plan pursued by Debtor. (*See In re Rusty Jones, Inc.,* 110 B.R. 362 (Bankr. N.D.Ill.1990). Accordingly, Much Shelist should bear the cost of some of these largely useless expenses. The vendors of those services deserved to be paid, but the law firm that requested their wasteful services should bear the expense thereby brought on the estate without benefit to that estate. This is not a "surcharge" which may be imposed on a trustee; rather it is a reduction of fees to reflect the attorneys' inattention to duty to serve the estate and its creditors, and the negative consequences to the client. *In re Consupak Inc.,* 87 B.R. 529, 551–2. (Bankr.N.D.Ill.1988).

(b) Much Shelist argues that it should not be penalized for fees paid to E & Y because E & Y was hired to examine the tax consequences of various reorganization ideas and Debtor's counsel was merely fulfilling Debtor's obligation to explore ways in which a feasible plan of reorganization may be created. However, an examination of E & Y's fees show that it was engaged for more than mere exploration. While $28,870 was billed for initial research & development work, the bulk of the fees and expenses related to efforts to obtain a private letter ruling from the IRS, and efforts to confirm unconfirmable plans. Indeed, most of E & Y's work related to the very features of the failed Plan that were the key reasons for failure of that Plan. Therefore, Much Shelist's fees shall be reduced to reflect its inattention to duty in having E & Y as well as VCI perform a great deal of expensive work that proved to be of no value.

(c) Much Shelist will not be penalized for E & Y's initial research & development work. Also, Much Shelist's fees will not be reduced for E & Y's work on tax return assistance and tax indemnification because those services were beneficial to the estate in its liquidation. However, the remainder of E & Y's fees related to the efforts to confirm an unconfirmable plan. Consistent with treatment of fees concerning the fourth plan, the fees of Much Shelist shall be reduced by an amount equal to 80% of the remainder of E & Y's fees and expenses or $79,653.43.[9]

**9.** This figure is calculated as follows:

|  |  |
|---|---|
| Total Ernst & Young Fees and Expenses: | $144,683.89 |

Less—

| | |
|---|---|
| Initial Research & Development: | $28,870.00 |
| Tax Return Assistance: | 16,503.50 |
| Tax Indemnification: | 6,196.50 |
| Preparation of Fee Application: | 1,547.10 |
| (3% of the foregoing categories) | |
| Expenses: | 2,000.00 |

48. The total of expenses allowed from those requested by Much Shelist is $2,517.70,[10] but Much Shelist's fee allowance must be reduced by $79,653.43 in unnecessary expenses that it caused to be due and paid to other professionals without corresponding benefit to the estate.

## III. CONFLICT OF INTEREST

49. Conflicts of interest are prohibited by § 327(a) and § 328(c) of the Bankruptcy Code. These provisions create an ongoing duty on the part of all professionals hired by the estate to avoid conflicts of interest.

50. Sections 327(a) and 328(c) apply to professionals retained by debtors-in-possession because a Chapter 11 trustee would have to comply with § 327, and § 1107(a) gives a debtor-in-possession rights and responsibilities of a trustee. *In re Al Gelato Continental Desserts, Inc.*, 99 B.R. 404, 406 (Bankr.N.D.Ill.1989).

51. Section 327(a) acts prospectively, providing that "the trustee, with the court's approval, may employ one or more attorneys ... that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." In that connection, the word "trustee" applies to a debtor in possession. 11 U.S.C. § 1107; *In re Met–L–Wood Corp.*, 115 B.R. 133, 135 (N.D.Ill.1990); *Matter of PHM Credit Corp.*, 99 B.R. 762, 766 (E.D.Mich.1989). To implement this provision, Bankruptcy Rule 2014 requires that orders to approve the employment of attorneys shall be made only pursuant to an application which "shall state the specific facts showing ... to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants ...," and is accompanied by an affidavit of the person to be employed "setting forth the person's connections with the debtor, creditors, or any other party in interest ..."

52. Generally, noncompliance with § 327 and Rule 2014 leads to forfeiture of compensation, even if valuable services were furnished to the estate. *In re Peoples Savings Corp.*, 114 B.R. 151, 155 (Bankr.N.D.Ill.1990). The court can also disqualify a professional after retention but before completion of the task for which that person was retained by the estate. Authority to disqualify a professional is not explicitly set forth in the Bankruptcy Code. However, that authority arises out of the court's equity powers. *In re PHM Credit Corp.*, 99 B.R. at 766 ("Bankruptcy courts, as courts of equity, also have discretion to enforce § 327 by disqualification"); *In re Roger J. Au & Son, Inc.*, 65 B.R. 322, 326 (Bankr.N.D.Ohio 1984) ("while disqualifica-

(The approved work categories constitute approximately 35% of the total fees, sought by E & Y, so about 35% of E & Y expenses are allocated to the approved work.)

| | |
|---|---:|
| Deductible Ernst & Young Fees and Expenses: | $89,566.79 |
| Valuation Consultants fees: | 10,000.00 |
| | 99,566.79 |
| | × 80% |
| | $ 79,653.43 |

10. The allowed expenses are computed as follows:

| | |
|---|---:|
| Expenses Requested in 1st and 2nd Applications | $28,011.58 |
| Expenses Requested in 3rd and Final Applications | 15,271.70 |
| Total Expenses Requested: | $43,283.28 |
| Expenses Disallowed Herein | (12,754.00) |
| Total Expenses Previously Reimbursed: | (28,011.58) |
| Total Allowed and Outstanding Expenses: | $2,517.70 |

tion is not a legislatively imposed sanction, this court, as one of equity ... certainly has the power to so act"). Also, the court that gives approval inherently retains the power to revoke its approval should circumstances change or new information become available. *In re Diamond Mortgage Corp.*, 135 B.R. 78, 89 n. 7 (Bankr.N.D.Ill. 1990).

■ The remedies of disqualification and denial of fees can be combined to remove a disqualified professional and deny compensation for past violations. *Diamond Mortgage Corp.*, 135 B.R. 78, 89 n. 7 (Bankr.N.D.Ill.1990).

■ 53. Section 328(c) acts retrospectively and grants Bankruptcy courts the authority to penalize those who have failed to meet the requirements of § 327(a) and Rule 2014. Section 328(c) provides:

Except as provided in section 327(c), 327(e) or 1107(b) of this title, the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed. 11 U.S.C. § 328(c).

Fees may be disallowed and the court may order return of fees already paid if a professional hired under § 327 is no longer disinterested. *In re Grabill Corp.*, 113 B.R. 966, 969 (Bankr.N.D.Ill.1990).

■ 54. Section 327(a) provides a two prong test for employment of professionals by the estate. First, the professional must not hold or represent an interest adverse to the estate. Second, the professional must be a disinterested person. In addition to the specific requirements of § 327(a), two additional requirements are implied: (1) the professional must disclose to the court and the parties in interest all facts which might bear on the professional's qualification for

retention both at the time of the original application and on an ongoing basis, and (2) the professional must live up to all requirements of appropriate professional codes of conduct on a continuous basis. *Diamond Mortgage* at 89.

■ 55. By judicial definition, "holding an adverse interest to the estate" means:

(1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or

(2) to possess a predisposition under circumstances that render such a bias against the estate.

*In re Al Gelato*, 99 B.R. at 407; *In re Roberts*, 46 B.R. 815, 827 (Bankr.D.Utah 1985), *aff'd in relevant part and rev'd in part*, 75 B.R. 402 (D.Utah 1987). An attorney is disqualified if he either falls into this definition or represents somebody who is within this definition.

■ 56. The Code defines a "disinterested person" in § 101(13)(E) as one who "does not have any interest materially adverse to the interest of the estate ... by reason of any direct or indirect relationship to, connection with, or interest in, the debtor ... or for any other reason." 11 U.S.C. § 101(13)(E); *In re Grabill*, 113 B.R. at 968. Section 101(13) is a "guideline for the court to follow in its sound discretion to insure that persons employed shall have the essential character of independence and disinterestedness which is required." *In re Roberts*, 46 B.R. at 829. This section includes anyone who "in the slightest degree might have some interest or relationship that would color the independent and impartial attitude required by the Code." *Id.*

57. Much Shelist argues that it complied with § 327 and Rule 2014 because there were no conflicts of interest, so there was nothing to report in their affidavit or any other time. Thus, two issues arise: First did Much Shelist's connections with two dominant shareholders of the Debtor disqualify the firm from representing the Debtor? Second, should Much Shelist have

disclosed these connections in their Rule 2014 application and supporting affidavits?

### 1. Conflict of Interest

58. Much Shelist argues that a connection with a party in interest is not an open ended requirement; it is limited to the representation of clients who have economic interests that may be adverse to the debtor. An implied condition to this argument is that Grauer and Grossman's economic interests were not and could not have been adverse to Rusty Jones. However, it is clear from the proceedings of this case, that Grauer and Grossman's interest were adverse to the Debtor. See, e.g. 110 B.R. at 367 ("The new 'investors' during this bankruptcy made a number of efforts … to obtain … benefit from the cash assets with which the Debtor started the bankruptcy. Most of these efforts were not for good business reasons and were contrary to the interests of the estate and its creditors.")

59. It is also clear that their interests have been adverse to the Debtor from the time those individuals acquired control of the Debtor until the time that the fifth plan was confirmed, and that Much Shelist consistently acted in their individual interests. Mr. Chatz was the person who introduced Grauer and Grossman to Wortman to arrange the acquisition. Mr. Chatz and Morrie Much then participated in the acquisition negotiations and in creating the Management Agreement that this court found to be "unwarranted, without substantial benefit to the estate, and unnecessary." 110 B.R. at 368. Moreover, strategies for a future Chapter 11 filing were discussed at that time.

60. Much Shelist continued to act in the interests of Grossman and Grauer in every step of the bankruptcy proceedings including the motion to assume the Management Agreement, the motion to employ Grossman, Grauer, and Knopfler, the disputes between the shareholders of Rustco, the moves to 55 W. Monroe and to MacArthur Blvd., and the formation of the plans of reorganization. The facts of this case also reveal a motive for aligning with Grossman and Grauer because of Chatz's debt to Grauer, his joint ownership in the MacArthur Blvd. property, and Much Shelist's representation of North American in other bankruptcy proceedings and the lease dispute.

61. It is well established that simultaneous representation of both a debtor and a debtor's shareholder may under some circumstances create a conflict of interest under sections 327 and 328. Attorneys for a Chapter 11 corporate debtor owe a fiduciary duty to the corporation and not to the employees, officers, directors, or dominant shareholders of the corporation or of a controlling parent company. *In re Grabill Corp.*, 113 B.R. at 966; *In re Consupak, Inc.*, 87 B.R. 529, 549 (Bankr. N.D.Ill.1988); *In re Kendavis Industries Int'l, Inc.*, 91 B.R. 742, 752 (Bankr. N.D.Tex.1988); *In re Roger Au & Son, Inc.*, 71 B.R. 238, 243 (Bankr.N.D.Ohio 1986). Thus, counsel for the estate cannot close their eyes when the debtor's principals are not acting in the best interests of the estate and its creditors, and certainly cannot aid the adverse activity. *In re Consupak*, 87 B.R. at 549. Instead, debtors' attorneys must fulfill their fiduciary duties in these situations and take whatever steps are necessary to oppose the detrimental activity.

62. Many courts have found conflicts of interest when attorneys have represented both a debtor-in-possession and the debtor's shareholders. See, e.g., *In re Grabill Corp.*, 113 B.R. 966; *In re Star Broadcasting, Inc.*, 81 B.R. 835 (Bankr.D.N.J.1988); *In re Kendavis Industries*, 91 B.R. 742; *In re McKinney Ranch Associates*, 62 B.R. 249 (Bankr.C.D.Cal.1986); *In re Watson Seafood & Poultry Co.*, 40 B.R. 436 (Bankr.E.D.N.C.1984); *In re Chou–Chen Chemicals, Inc.*, 31 B.R. 842 (Bankr. W.D.Ky.1983); and *In re Philadelphia Athletic Club, Inc.*, 20 B.R. 328 (E.D.Pa. 1982). *Kendavis Industries* was in many ways similar to the case at bar. There, the stockholders had no "recognizable economic interest" in the reorganization, and yet the reorganization plan was "inexplicably generous" to them when compared to the

creditors. 91 B.R. at 749. Further, evidence was manipulated in an attempt to confirm the plan. The court found that the debtor's counsel's actions in the proceedings were designed to benefit the shareholders and not the estate, and that counsel was therefore representing an adverse interest to the estate. *Id.* at 750–53.

63. In *Philadelphia Athletic Club*, three shareholders were in a dispute over ownership of the debtor when one of them filed a Chapter 11 petition on behalf of the debtor. The other two retained counsel to contest the filing and the plan. As a result of counsel's efforts on behalf of the two persons, the one who filed the petition was removed and a trustee was appointed. The attorney then left the employ of the shareholders and the trustee applied to the court for an order authorizing him to employ as his counsel the attorney for the two shareholders. The court held that counsel was clearly not disinterested, had a materially adverse interest to the debtor's estate, and was therefore disqualified under § 327(a). 20 B.R. at 335–337.

64. The concerns which led the court in *Philadelphia Athletic Club* to disqualify attorneys who represented or formerly represented two principals of the Debtor apply here as well. The court there observed that "[w]hen performing their duties to the estate, [counsel] may be tempted, perhaps unconsciously, to cater to the interests of their former clients, rather than to make decisions or give advice solely with the best interests of the estate." *Id.* at 338. In this case, it is clear that Much Shelist was in fact acting in the best interests of the principals and not solely for the estate.

65. The U.S. Trustee also relies on *In re Diamond Mortgage*, 135 B.R. 78 (Bankr. N.D.Ill.1990) in which Judge Ginsberg denied a debtor's attorney 60% of his fee application. In that case, an attorney was retained by the debtor to enforce mortgages held by the debtor and to collect on the loans to the mortgagors. Among the facts not disclosed to Judge Ginsberg in the Rule 2014 application was the attorney's prior representation of the debtor, his prepetition claim against the debtor, that the attorney

shared an office with a person who invested heavily in the debtor, and that the attorney had originally been hired by some of the very people who were responsible for the debtor's current condition. In the course of his representation, the attorney embarked on a fraudulent scheme to get his prepetition debt paid off. In foreclosure proceedings, he purchased a form of title insurance from his office mates which turned out to be worthless. He further committed legal malpractice which exposed the estate to considerable liability.

66. The court found that the attorney engaged in both actual and potential conflicts of interest because the attorney had acted in the interests of a buyer of a foreclosed property and the interests of his office mates to the detriment of the estate. *Id.* at 92–93. The court stated, "[counsel] was guilty of allowing serious conflicts of interest to arise and affect his representation of these debtors to the debtor's detriment." *Id.* at 93. Thus, Judge Ginsberg found that the attorney violated § 327, § 328, and Rule 2014 and reduced his fees accordingly.

67. This case is similar to *Diamond Mortgage*. Like the attorney in *Diamond Mortgage*, Much Shelist did not reveal its connections and prior representations of the Debtor's owners to the Court in its application. Also, like the attorney in *Diamond Mortgage*, Much Shelist acted in the interests of the people with whom it had a relationship to the detriment of the Debtor.

68. Accordingly, Much Shelist had a conflict of interest in representing the Debtor when it had such a longstanding relationship and close connections with the Debtor's principals and acted in their interests to the detriment of their client, the estate of the debtor in possession.

69. Much Shelist also had a particular conflict of interest because Mr. Chatz had an ownership interest in the office space which was leased by the Debtor. Thus, Much Shelist held an adverse interest to the estate since the estate could incur liability to the pursuant to the lessor-lessee relationship. This relationship was known

to Morrie Much as early as December, 1989, but it was not revealed to the Court until after confirmation when the U.S. Trustee began its investigation into the connections between the firm and the Debtor's principals.

70. Much Shelist argues that Chatz's interest did not create a conflict of interest because Chatz was suspended while the Debtor was located at MacArthur Boulevard. However, Chatz never became fully disaffiliated with the firm,[11] and there is some evidence that he was at least part of conferences in order to remain informed about this case while under suspension. During the period covered herein, Federal courts in this District have adopted the ABA Model Code of Professional Responsibility in deciding issues of attorney disqualification. See former Local District Rule 3.54(b), since vacated by General Order March 21, 1991, and replaced by new rules; *Rosenberg Corp. v. Champion Spark Plug Co.*, 648 F.Supp. 1040, 1041 (N.D.Ill.1986); *Liess v. General Electric Co.*, 659 F.Supp. 979, 981 (N.D.Ill.1987); *Monon Corp. v. Wabash Nat. Corp.*, 764 F.Supp. 1320, 1322 (N.D.Ind.1991), citing *Novo Terapeutisk Laboratorium v. Baxter Travenol Laboratories, Inc.*, 607 F.2d 186 (7th Cir.1979). Under those rules, Chatz's disqualifying interest must be imputed to the firm under DR5–105(d), ABA Code of Professional Responsibility. See also MR 1–10, ABA Model Rules of Professional Responsibility and Ill.Rev.Stat. Ch. 110A, Art. VIII, Rule 1.10. Thus, Much Shelist was in violation of 11 U.S.C. § 328 independent of its other connections to Grauer and Grossman.

### 2. Disclosure under Rule 2014

71. This Court has an obligation to review practice before it to preserve the integrity of the bankruptcy process. *In re Michigan General Corp.*, 78 B.R. 479, 484 (Bankr.N.D.Tex.1987). However, the Court has no duty to rummage through files or conduct independent fact-finding investigations in order to determine whether prospective attorneys are involved in actual or potential conflicts of interest.

It is the duty of the attorney to so inform the court. *In re Churchfield Management & Invest. Corp.*, 100 B.R. 389, 393 (Bankr.N.D.Ill.1989). Thus, Rule 2014 must be read broadly. "All facts that *may* be relevant to a determination of whether an attorney is disinterested or holds or represents an interest adverse to the debtor's estate must be disclosed to the court." (emphasis added) *Id.*, quoting *Diamond Lumber v. Unsecured Creditors' Committee*, 88 B.R. 773, 777 (N.D.Tex.1988). See also *In re Hathaway Ranch Partnership*, 116 B.R. 208, 219 (Bankr.C.D.Cal.1990).

72. The purpose of disclosure is to permit the court to determine whether the attorney is disqualified or whether further inquiry is needed before making the determination. Therefore the decision about what to disclose is not left to the prospective attorney "whose judgment may be clouded by the benefits of the potential employment." *In re Lee*, 94 B.R. 172, 176 (Bankr.C.D.Cal.1988). Thus, there is no merit to the Much Shelist argument that it did not have to disclose its connections to the Debtor's principals because its attorneys did not feel that a conflict existed. Clearly, it should have been apparent from Much Shelist's involvement with the acquisition of the Debtor and the firm's other present connections with Grossman and Grauer that conflicts of interest would at least be an issue. For this reason, the Court concludes that Much Shelist failed to make an adequate disclosure of connections to parties in interest in this case under Rule 2014.

73. Much Shelist argues that it did not violate Rule 2014 because this Rule requires only that representation of clients with claims against Debtor, or clients against whom the Debtor has claims pending, be disclosed. Relying on language of the Rule and broad purpose which it services, the U.S. Trustee argues that the Rule requires counsel to disclose "all of its connections with" parties in interest. That is correct. Section 327 is intended to prevent the estate from being represented by peo-

---

**11.** Chatz is currently listed in Sullivan's Law    Directory as being of counsel at Much Shelist.

ple who "might have some interest or relationship that would color the independent and impartial attitude required by the Code." *In re Roberts,* 46 B.R. at 829. Thus, attorneys are required to disclose connections which demonstrate a predisposition in favor of one of parties in interest. This case is a vivid example of how the estate is hurt when it is represented by a firm that is partial to one or more parties in interest or control.

74. This is not to say that every possible connection need be disclosed by counsel. Rule 2014 does not require an attorney to dredge up every past connection, however remote, that he or she ever had with the parties in interest in the case. For example, the fact that Chatz and Grossman owned a hot dog stand together 20 years ago is such a remote connection that it is *de minimus* and irrelevant to the § 327 analysis. What is important are connections that presently exist or recently existed between the attorney and the parties in interest, and also past connections of business or personal nature that are either related to the bankruptcy proceedings or could reasonably have an effect on the attorney's judgment in the case.

75. Much Shelist also suggested that Rule 2014 has a criminal aspect to it because it requires an affidavit which is subject to 18 U.S.C. § 152,[12] and thus it must be read under an argued "rule of lenity," so as to interpret ambiguities in its favor. The thrust of this argument is that since Much Shelist assertedly could not have been certain about whether to report the connections, it did not violate the rule by not reporting them. The first and most obvious reply to this argument is that applications for employment are wholly civil, being filed under Bankruptcy rules and statutory provisions earlier discussed, not under any criminal statute. Thus, the "rule of lenity" however it may be defined, does not apply in this context.

76. Second, it is well established that conflict of interest rules are more strictly applied in the bankruptcy context than in other areas of law, at least insofar as professionals retained by the estate are concerned. The strict approach maintains the integrity of the bankruptcy process, *In re Michigan General Corp.,* 78 B.R. at 484, and assures counsel's undivided loyalty to the client. Such loyalty is needed because the client is a fiduciary for the creditors. *In re Lee,* 94 B.R. at 178. Interpreting conflict of interest rules with any "rule of lenity" in this context would go against this basic principle of bankruptcy law. The court should not interpret the conflict of interest rules together with any "rule of lenity." Consequently, the Court is not bound to interpret ambiguities in favor of Much Shelist.

77. Finally, Much Shelist attempts to blur the issues by arguing that if the U.S. Trustee wanted information concerning connections between Chatz and Grossman and Grauer, then he should have asked for it in the U.S. Trustee's Administrative Order No. 3. Administrative Order No. 3 is irrelevant because it dealt only with the relation of third-party contractors to the Debtor. That Order required third party contractors to disclose their connections to parties in interest. Its subject matter was not attorneys. Further, it is not the duty of the U.S. Trustee to search out connections between attorneys and parties in interest. It is the responsibility of attorneys themselves to disclose their connections; that is the purpose of Rule 2014. See *In re Churchfield,* 100 B.R. at 393. Therefore, Much Shelist is not relieved of its duty to disclose because the U.S. Trustee made no particular demand for that which the firm was obliged to disclose.

### 3. Consequences of violating § 327 and 2014

78. As pointed out above, disallowance of fees is appropriate when an attorney is found not to be disinterested.

---

12. 18 U.S.C. § 152 criminalizes the knowing making of a false oath in a bankruptcy case. There is no indication that criminal charges are pending or threatened against anyone in this case under this provision.

*In re Grabill,* 113 B.R. at 969, citing *Wolf v. Weinstein,* 372 U.S. 633, 641, 83 S.Ct. 969, 975, 10 L.Ed.2d 33 (1963) ("a fiduciary may not receive compensation for services tainted by disloyalty or conflict of interest"). See also, *Diamond Mortgage,* at 92 ("total or partial disqualification or reduction or denial of fees and expenses is required, without exception, if the conflict of interest is actual").[13]

79. When faced with similar situations, courts have deducted a significant percentage of the fee application even where valuable services were performed. In *Diamond Mortgage,* the court disallowed 60% of the attorney's fee application. The court in *Kendavis Industries* deducted 50% of the fee application in response to the attorney's conflicts of interest and "the rendition of services of doubtful value" *In re Kendavis* 91 B.R. at 762. The court in *Roger Au & Son* determined that the attorney would not be allowed full compensation, but "the firm was entitled to some compensation" for its substantial effort expended on the case. 71 B.R. at 243.

80. This Court shall disallow 60% of the fees provisionally allowed in Part I of the discussion. This ruling takes into account that Much Shelist has expended considerable energy on this matter and successfully pursued the matter to a confirmation of a plan. It has also performed valuable services to the estate in pursuing the collection of amounts owed to the Debtor and representing the Debtor in a variety of other matters. Balancing that against the sorry record described hereinabove, it is appropriate to reduce fees provisionally allowed to Much Shelist by 60% as an appropriate sanction for their failure to comply with Rule 2014, § 327 and § 328.

81. The Court does not reduce the reimbursement of expenses allowed in Part II. In *In re Philadelphia Athletic Club,* 38 B.R. 882 (Bankr.E.D.Pa.1984), the court denied all fees to the firm after it was found not to be disinterested, but allowed the firm to be reimbursed for its expenses. 38 B.R. at 884. The court stated, "the [conflict of interest] rule for fees may be applied by the bankruptcy judge to expenses but, generally, expenditures should be allowed which have clearly benefitted the estate." *Id.* citing *Woods v. City National Bank and Trust Co. of Chicago,* 312 U.S. 262, 269–70, 61 S.Ct. 493, 497–98, 85 L.Ed. 820. See also *In re Florida Peach Corp. of America, Int'l. Div.,* 110 B.R. 589, 593 (Bankr.M.D.Fla.1990). Since the Court has already denied all the expenses which were not beneficial to the estate in Part II, Much Shelist may be reimbursed for the remaining expenses.

## IV. MUCH SHELIST AND THE BEATRICE LITIGATION

82. The U.S. Trustee would also have this Court disqualify Much Shelist from representing Rusty Jones in the *Beatrice* litigation. Parties in interest and Debtor's counsel opined earlier in this case that the litigation has a value in the range of many millions of dollars. Various parties noted at the hearing on this matter that changing counsel at this stage in the litigation would cause a great hardship for the debtor due to the advanced state of the proceedings. This court finds it unnecessary to disqualify Much Shelist from representing the Debtor in that litigation at this time because the conflict ended with confirmation of the plan. Under the plan, the Debtor is put into the hands of a liquidating trustee, and all the shareholders' interests were eliminated. Thus, Grauer and Grossman are out of the picture, and since the source of the disqualification was the firm's connection with them and their property, their departure ends the source of conflict.

83. An important factor adding support to this decision is that the firm and its attorneys were retained on a contingent fee basis to pursue the litigation. They will

---

**13.** Some courts find a distinction between actual and potential conflicts of interest which affects the discretion of the court concerning the disallowance of fees. See e.g., *In re BH & P, Inc.,* 103 B.R. 556, 563 (Bankr.D.N.J.1989). However, even if that distinction exists, it is irrelevant to this case, since Much Shelist had an actual conflict of interest during the bankruptcy proceedings.

not receive compensation until and unless the matter is concluded and the Debtor receives any proceeds of the litigation. The amount of their fees is tied to the amount of any recovery. Thus, Much Shelist has every incentive to obtain the maximum possible recovery as soon as possible.

84. Also, this matter is being handled by a different department at the firm, the litigation department. A different set of attorneys than the people who worked on the bankruptcy matter are pursuing this claim. While disqualification of one attorney disqualifies the whole firm (see Conclusion Number 70), the taint of the conflict is lessened by the distance between the litigation attorneys who were not involved in the disqualifying conduct and the bankruptcy attorneys who were.

85. Most significant here is the fact that obtaining new experienced counsel at this point in the complex *Beatrice* litigation would be difficult and at best would delay that litigation and perhaps be more costly to the estate through a less favorable contingency fee agreement. Changing lawyers in the middle of the litigation stream would harm the interests of creditors, and would also impact adversely on the District Court's management of the *Beatrice* case. It might take up to six months to obtain new counsel and bring them up to speed in that complex case. All of these consequences are not warranted in this case. Though a court should consider the possibility of full disqualification from all engagements that relate to obtaining the initial engagement improperly, that is not warranted or appropriate here.

### V. MISCELLANEOUS MATTERS

86. In a supplemental application, Much Shelist seeks to be reimbursed for defending itself in these fee applications. The firm hired independent counsel and ask to be reimbursed for that counsel's fee of $81,918.77. In light of the Court's findings that a conflict of interest existed and that Much Shelist failed to comply with Rule 2014, this application to be reimbursed is denied. In no way did this expense benefit the estate or its creditors. This was an expense at the firm's instance incurred in defending its own interests and prosecuting its own fee and expense claims. Indeed, for that firm to seek reimbursement for this expense in the context of this case certainly took great courage.

87. The Court also denies Much Shelist's request in the third application to receive the $21,914.09 previously withheld from the first and second fee applications. The work performed for which such payment was withheld was to be finally evaluated at the end of Much Shelist's work. Upon such review, the amounts previously allowed were sufficient in amount to compensate for necessary an reasonable services and the value thereof. The $21,914.09 previously withheld is now disallowed.

### CONCLUSION

In conclusion, Much Shelist's application for fees is allowed in the amount of $171,347.40. This results from the provisionally allowed fees of $428,368.50 [14] reduced by 60%. Much Shelist is also allowed reimbursement of expenses in the amount of $2,517.70. However, after deducting the $224,769.60 of fees already received [14] and the $79,653.43 of fee expenses paid to other professionals that will be deducted from allowed fees for reasons discussed, Much Shelist is owed no additional fees or expenses and is ordered to reimburse $130,557.93 to the estate. However, Much Shelist will not be disqualified from representing the Debtor in its litigation against Beatrice.

### SUMMARY OF REQUESTS AND ALLOWANCES

| Work Category | Third Application (applied for) | (allowed) | Final Application (applied for) | (allowed) |
|---|---|---|---|---|
| #1 | $ 15,587.50 | $ 14,035.50 | $ 6,140.00 | $ 6,140.00 |

14. See footnote 8.

| Work Category | Third Application (applied for) | (allowed) | Final Application (applied for) | (allowed) |
|---|---|---|---|---|
| # 2 | n/a | n/a | n/a | n/a |
| # 3 | $ 17,920.50 | $ 15,134.50 | $ 2,186.00 | $ 1,205.00 |
| # 4 | 7,080.00 | 7,080.00 | n/a | n/a |
| # 5 | 2,193.00 | 2,193.00 | 1,832.00 | 1,832.00 |
| # 6 | 3,951.50 | 3,951.50 | 2,518.00 | 2,518.00 |
| # 7 | 3,743.00 | 3,743.00 | 768.00 | 768.00 |
| # 8 | 1,510.00 | 1,510.00 | n/a | n/a |
| # 9 | 2,808.50 | 2,808.50 | n/a | n/a |
| # 10 | 988.00 | 893.00 | 162.50 | 81.50 |
| # 11 | 62,139.50 | 1,376.50 | 27,360.50 | 0.00 |
| # 12 | 8,443.50 | 8,443.50 | 10,869.00 | 7,369.00 |
| # 13 | 62,719.00 | 12,544.00 | 81,900.00 | 66,032.00 |
| # 14 | 24.00 | 24.00 | n/a | n/a |
| # 15 | 70.00 | 70.00 | n/a | n/a |
| # 16 | 10,827.00 | 10,827.00 | 2,000.00 | 2,000.00 |
| # 17 | 7,903.50 | 7,903.50 | 2,528.00 | 2,528.00 |
| # 18 | 3,150.00 | 3,150.00 | 180.00 | 180.00 |
| # 19 | 1,566.00 | 1,566.00 | 1,215.00 | 1,215.00 |
| # 20 | n/a | n/a | n/a | n/a |
| # 21 | 189.00 | 189.00 | n/a | n/a |
| # 22 | 4,209.00 | 4,209.00 | 220.00 | 220.00 |
| # 23 | 54.00 | 54.00 | n/a | n/a |
| Total: | $217,076.00 | $101,705.50 | $139,879.00 | $92,088.50 |