**In the Matter of WEAVER POTATO CHIP CO., INC., Debtor.**

**Bankruptcy No. BK96–41363.**

United States Bankruptcy Court, D. Nebraska.

Jan. 12, 2000.

Richard P. Garden, Jr., Cline, Williams, Wright, Johnson & Oldfather, Lincoln, NE, for debtor.

Michael C. Washburn, Erickson & Sederstrom, Omaha, NE, for Dixon Attorneys International, PLCC.

## *MEMORANDUM*

JOHN C. MINAHAN, Jr., Bankruptcy Judge.

Dixon Attorney's International PLLC ("DAI") filed a final application for compensation and expenses, and allowance of administrative claim. The debtor objected to the fee application for several reasons,

including the disinterestedness of DAI attorney Harry Dixon, Jr. The parties have entered into a stipulation as to the final fee application. I approved the settlement agreement and herein set forth my conclusions of fact for the record.

## FACTS

During the administration of this bankruptcy case, debtor, Weaver Potato Chip Co., Inc., ("debtor") was represented by three different counsel: (1) This case was filed August 9, 1996, with William Biggs of Biggs, Derr & Napier as debtor's counsel; (2) On September 23, 1996, debtor entered into an application to employ Harry Dixon, Jr. ("Dixon") of DAI as debtor's counsel. The Court entered an order granting the application to employ DAI on October 7, 1996, effective September 6, 1996. On April 9, 1998, Dixon entered a motion to withdraw as counsel of record. Dixon's motion to withdraw as counsel of record was granted on June 2, 1998.(3) On June 25, 1998, the court entered an order granting the application to employ Richard P. Garden, Jr. of Cline, Williams, Wright, Johnson & Oldfather, as debtor's counsel.

DAI seeks payment of fees and expenses of $204,062.70. DAI's first amended interim fee application, covering September 6, 1996 through February 28, 1997 sought fees of $103,996.15 and expenses of $11,050.93. The Court allowed $51,998.08 in fees and $7,242.35 in expenses, deferring determination of the $55,815.65 balance of the requested fees and expenses until the time of the filing of the final fee application. Dixon reduced the $55,815.65 balance from the first amended interim fee application by $33,190.45, requesting in its final fee application $20,431.68 from the first amended interim fee application.

Dixon's second interim fee application, covering March 1, 1997 through April 30, 1997 sought fees of $22,719.00 and expenses of $1,252.54 and was approved. Dixon's third interim fee application, covering May 1, 1997 through July 31, 1997 sought fees of $21,898.50 and expenses of

$1,103.43 and was approved. Dixon's fourth interim fee application covering August 1, 1997 through October 31, 1997 sought fees of $27,652.50 and expenses of $1,285.51 and was approved. Dixon's fifth and final fee application covers November 1, 1997 through November 10, 1998, seeking fees of $47,170.35 (including the $20,431.68 balance from the first amended interim fee application) and expenses of $1,308.77. Included in the final fee application is a projected sum of $2,160.00 for fees and expenses to be incurred in the filing and service of the final fee application. To date, debtor has paid DAI $87,737.16 towards these fee applications.

The debtor asserts numerous objections to the fee application of DAI including that Mr. Dixon did not remain disinterested in several respects.

During the time he represented the debtor in this bankruptcy case, Mr. Dixon attempted to and succeeded in placing three of his acquaintances on debtor's board of directors (Steve Durham, Meredith Christensen and Frank Scott). In February of 1997, Mr. Dixon attempted to become elected as an officer of Weaver Potato Chip Co., Inc. and was nominated for the presidency of the corporation at a meeting of the board of directors. Although the three directors that Mr. Dixon placed on the debtor's board of directors voted for him, the remaining directors did not and Mr. Dixon was not voted president. During this period, Mr. Dixon told debtor's employees he would be the president of debtor, would inject large amounts of cash into debtor, promised large raises to debtor's employees, and would have his picture on all bags of chips produced by debtor.

Shortly after Mr. Dixon's retention to represent the debtor in October of 1996 and for a 30 day period, Mr. Dixon became an employee of Weavers in the capacity of a potato chip sales person. Mr. Dixon was advanced $6,588.88 in salary. After 30 days, Mr. Dixon's employment relationship

as sales person was terminated, and the $6,588.88 was credited as the first payment made on attorney fees.

On April 13, 1998 Mr. Dixon gave $10,-000 as a "voluntary disgorgement" of fees to debtor. At the same time, Mr. Dixon gave $400 in cash to Ed Weaver, president of debtor. Approximately one month later, Mr. Dixon requested the $10,000 back from debtor, and two men met with debtor's president and requested the $10,000 on behalf of Mr. Dixon. Mr. Weaver gave the men a check for $400.

## LAW

Bankruptcy Code § 328(c) provides, in part, that a professional's compensation for services and reimbursement of expenses may be disallowed if "at any time during such professional's employment under §§ 327 or 1103 . . . such professional person is not a disinterested person." 11 U.S.C. § 328(c).

■ A disinterested person means a person that is not an insider. 11 U.S.C. § 101(14)(A). An insider includes a director, officer, or person in control of the debtor; partnership including the debtor; general partner of the debtor; or relative of a general partner, director, officer, or person in control of the debtor. 11 U.S.C. § 101(31). A disinterested person cannot hold an interest materially adverse to the estate, creditors, or equity security holders. 11 U.S.C. § 101(14)(E). A materially adverse interest may be defined as:

(1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.

*In re Roberts,* 46 B.R. 815, 827 (Bankr. D.Utah 1985), *aff'd* in relevant part and *rev'd* in part, 75 B.R. 402 (D.Utah 1987). A current employee or person employed by the debtor in the two years prior to

filing the bankruptcy petition is not a disinterested person under the Bankruptcy Code. 11 U.S.C. § 101(14)(D).

■ Rule 2014 requires applications for retention of professionals to include a verified statement of the person's connections with, "the debtor, creditors, any other party in interest. . ." Fed.R.Bankr.P. 2014(a). The rule requires ongoing disclosures of connections throughout the bankruptcy case. *In re Begun,* 162 B.R. 168, 177 (Bankr.N.D.Ill.1993).

## DISCUSSION

■ I conclude that by attempting to become president of the debtor-corporation, Mr. Dixon became an insider as defined in 11 U.S.C. § 101(31). The definitional sections of the Bankruptcy Code regarding insiders do not provide an exclusive list of the capacities in which someone must act in order to technically qualify as an insider. *See* 11 U.S.C. § 102(3). As stated in the Bankruptcy Code, an insider includes a director or officer of the debtor. Insider status applies to any relationship that would remotely color the independence and impartial attitude required by the Code and its Rules.

The question is not necessarily whether a conflict exists—although an actual conflict of any degree of seriousness will obviously present a towering obstacle—but whether a potential conflict, or the perception of one renders the interest materially adverse to the estate of the creditors.

*In re BH & P, Inc.,* 949 F.2d 1300, 1312 (3d Cir.1991).

By attempting to become an officer, indeed chief operating officer of the debtor-corporation, Mr. Dixon became an individual who was not disinterested, and his actions in connection therewith rendered him an insider for purposes of the Bankruptcy Code. Mr. Dixon's effort to become president of the corporation concluded in a February 1997 board meeting where Mr. Dixon was formally nominated

to become president. The three directors, each of whom had been placed on the board by Mr. Dixon's insistence, voted for his presidency.

 Mr. Dixon was not elected president, but the attempt cuts to the very policy of impartiality as required by the Bankruptcy Code and its strict conflict of interest rules. The Code requires those employed by the debtor to disclose their relationship with the debtor, and compensation may be denied to those who become interested or hold an interest adverse to the estate. FED.R.BANKR.P. 2014(a); 11 U.S.C. § 328(c). Because the integrity of the bankruptcy process requires strict adherence to conflict of interest rules, a "rule of lenity" as to employment of professionals for the estate would go against the fiduciary interests the debtor owes to creditors. *In re Rusty Jones, Inc.*, 134 B.R. 321, 346 (Bankr.N.D.Ill.1991). The conflict of interest is evidenced in Mr. Dixon's representations to certain employees of the debtor that he was going to become president of the debtor and influx cash into its operations, his promises of large raises to debtor's employees, and the declaration his picture would be on all bags of chips produced by the debtor.

### DISALLOWANCE OF FEES

A final evidentiary hearing took place upon the final fee application and objection. Before I ruled, I was informed by counsel for the debtor and counsel for DAI that a settlement agreement may be reached. Subsequently, a settlement agreement was entered into by DAI and the debtor. Notice of this agreement was served on all interested parties, a resistance date was set, and no creditor objected to the settlement agreement. I find the settlement agreement properly outlines the issue of Mr. Dixon's loss of disinterest-

edness and addresses it appropriately. The settlement agreement disallows certain categories of fees, including $50,000 based on Mr. Dixon's lack of disinterestedness. The fees and expenses disallowed totals $76,325.54.[1] I find this amount of disallowed fees to be appropriate in this case, and hereby approve the settlement agreement.

IT IS HEREBY ORDERED, the settlement agreement entered into between the DAI and the debtor is hereby approved. DAI is allowed $137,737.16 in fees and expenses in connection with its representation of debtor in this matter, inclusive of fees and amounts previously received by DAI.

IT IS FURTHER ORDERED, that DAI will have an administrative expense for its fees as set forth in the settlement agreement herein.

---

1. The settlement agreement states $26,325.54 in fees are disallowed for reasons other than disinterestedness, such as: services rendered were unnecessary or unbeneficial to the bankruptcy estate; charges were inflated or duplicative; and results obtained by DAI were inferior in quality as one may reasonably expect.

The following fees are disallowed: $234 for Pro Copy litigation; $5,091.54 for Biggs, Derr & Napier objection; $10,000 for Guy's litigation; $11,000 for the plan and disclosure statement; and $50,000 for lack of disinterestedness.